**LIBERTY SIGN COMPANY et al.,**
Petitioners,

v.

**Lee E. NEWSOM, Respondent.**

No. B–390.

Supreme Court of Texas.

March 13, 1968.

Rehearing Denied May 1, 1968.

---

Malone, Seay, Gwinn & Crawford, George Seay and Durwood Crawford, Akin, Gump, Strauss, Hauer & Feld, Dallas, for petitioners.

Grady, Johnson, Smith & Blakeley, Robert C. Johnson, Dallas, for respondent.

WALKER, Justice.

This suit was brought by Liberty Sign Company to recover accrued rent, liquidated damages and attorney's fees alleged to be owing under its advertising display sign rental contract with Lee E. Newsom. The Court of Civil Appeals held that Liberty is not entitled to liquidated damages because: (1) Liberty had breached the lease contract by failing to replace the signs after they were removed by Newsom's assignee; and (2) Liberty, by demanding and accepting payment of accrued rent, had lost its alternative right to terminate the lease and claim liquidated damages. We do not agree with either of these conclusions.

There is no dispute as to any of the basic facts. In September, 1964, Newsom opened a restaurant known as Ginny Lee's Pancake House in Preston Royal Plaza, a shopping center in Dallas. The interior portion of the building occupied by the restaurant was held by Newsom under lease. The exterior of the building as well as the adjoining parking area was controlled by one Padgett, who owned the shopping center.

On August 14, 1964, Liberty and Newsom executed a written contract under the terms of which Liberty agreed to furnish, install and maintain an advertising display sign on the parking lot of the shopping center for a period of five years and as long thereafter as the parties might elect. Newsom paid Liberty $827.22 when the contract was signed and agreed to pay an additional $153.35 plus tax per month "payable in advance for 60 consecutive months, commencing on the day Lessor's installation of display is completed."

On September 16, 1964, the contract was amended by a written rider in which Liberty agreed to furnish, install and maintain an additional canopy sign on the roof of the building. Newsom agreed to and did pay an additional initial rental of $357.00, and the monthly rental payment was increased from $153.35 to $191.85 plus tax. Liberty furnished and installed the two signs, making its own arrangements with Padgett and obtaining his consent.

The installation was completed the latter part of September, and Newsom paid the installments of rent due October 1 and November 1. He was over a month late in making the December 1 payment, and defaulted in the installments due January 1, February 1 and March 1, 1965. Liberty was satisfied with his credit, however, and did not immediately elect to terminate the lease.

In February, 1965, Newsom sold the restaurant, including his interest in the signs, to the 2538 Corporation, hereinafter referred to as the corporation, which was wholly owned by J. H. Stecker. The written contract of sale obligated the corporation to assume the rental payments to Liberty, and the corporation further agreed not to remove or damage any of the property without the consent of both Newsom and the owner. It was also provided that Newsom would have the right to take possession

of all properties, rights and interests covered by the contract if the corporation defaulted in the performance of any of its undertakings. Stecker guaranteed performance of the contract by the corporation, but Liberty did not consent to the assignment.

Stecker changed the restaurant into a steak house, redecorated the premises and began business about February 16, 1965. He considered the signs unsuitable for his new operation and requested Liberty to make certain alterations. They were unable to agree on the cost, and Stecker wrote Liberty demanding that the signs be removed by March 15th. He advised that if Liberty failed to do so he would have the signs removed and delivered to Liberty's warehouse.

This threat was discussed by the attorneys for Liberty and Newsom. Both Liberty and Newsom objected to the removal of the signs, and each insisted that the other was obligated to protect the signs and should obtain an injunction against Stecker. Neither took legal action of any kind, but Newsom's attorneys advised Stecker on several occasions that Newsom objected to the removal of the signs. Liberty informed Newsom that it would declare the lease terminated and the liquidated damages due if the signs came down.

On March 21, 1965, Stecker had the signs removed by Lawrence Schell, the owner of Dallas Neon Sign Company, who delivered them to Liberty. Oliver, who was a vice-president of Liberty, and Newsom went to the shopping center while the signs were being taken down. Newsom remained across the street. Oliver took some pictures and then informed one of the workmen that he was employed by Liberty and that the signs belonged to Liberty.

Four days later the attorneys for Liberty wrote Newsom that "since the signs have been removed and Liberty has not received the payments due on the signs for the past three months, it has no alternative but to declare the contract in default and the entire amount due as set forth therein." The letter included a demand for the payment of the following amounts claimed to be owing under the contract:

| | |
|---|---|
| Accrued and unpaid rent | $575.55 |
| 77% of unaccrued rent | 7,977.12 |
| 2% sales tax | 171.05 |
| Total | $8,723.72 |

When the claim was not paid, Liberty instituted the present suit against Newsom, Stecker and the corporation. Newsom prayed for judgment over against the corporation and Stecker, and also filed a third party action against Schell. During the trial Newsom paid the $575.55 accrued rent into the registry of the court. At the conclusion of the evidence, the trial court withdrew the case from the jury and rendered judgment in favor of Liberty and against Newsom, Stecker and the corporation, jointly and severally, for the amount claimed plus $2,750.00 attorney's fees. The $575.55 paid by Newsom into the registry of the court was credited on the judgment and withdrawn by Liberty. Newsom was given judgment over against Stecker and the corporation, and a take nothing judgment was rendered in favor of Schell. Only Newsom appealed.

The Court of Civil Appeals concluded, for the reasons mentioned above, that Liberty may not recover liquidated damages and is entitled to only the $575.55 accrued rent paid by Newsom into court plus reasonable attorney's fees. The judgment of the trial court in favor of Schell was accordingly affirmed, but as to the remainder of the case such judgment was reversed and the cause was remanded for a redetermination of the attorney's fees. 416 S.W.2d 442. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

The relevant provisions of the lease contract are as follows:

"1. Lessor shall, to Lessee's special order and specifically for Lessee's use, construct, install and, during the term of this Agreement, maintain for and lease to Lessee an advertising display(s) described in the specifications * * *.

* * * * * *

"5. In the event Display is destroyed or substantially damaged from any cause except deliberate act of Lessee or his agents, Lessor will, upon notification of such damage by Lessee, rebuild Display to conform to its original specifications * * *.

* * * * * *

"DISPLAY RENTAL TERMS
AND CONDITIONS

"A. Lessor shall use due diligence in furnishing, installing and maintaining Display, but the performance of Lessor under this Agreement shall be subject to any delay resulting from strikes, breakage, fire, labor disputes, unforseen commercial delays, war, act of God, or other causes beyond control of Lessor.

"B. Lessor, at its expense, shall maintain Display in good condition and appearance. If Display fails to operate for any reason except through fault of Lessee's agents or employees, Lessor shall, upon notice in writing by Lessee, repair Display within forty-eight hours of receipt of such notice * * *.

* * * * * *

"D. If Lessee shall default in payment of the rental herein provided for, Lessor may, at its option and without demand or notice, terminate this Agreement and remove the display at Lessee's expense. In such event, the unpaid rent for the unexpired portion or period of this Agreement shall become immediately due and payable. Lessee agrees to pay Lessor all such rents and any other amounts due Lessor, less 24% of un-accrued rentals, which amount Lessee agrees constitutes the actual liquidated damages Lessor shall sustain by reason of Lessee's default hereunder and that same is not a penalty. Lessee further agrees to pay Lessor the reasonable cost, including, but not limited to, attorney's fees incurred by Lessor in collecting any monies that shall accrue under the terms of this Agreement.

* * * * * *

"E3. Display, for all purposes, shall be deemed personal property, and shall not, by reason of attachment to realty be deemed a fixture or appurtenance thereto, and shall remain severable therefrom and the sole property of Lessor. Without prior written consent of Lessor, Lessee shall not, at any time or at any location, permit Display to be repaired, replace, altered or other work to be done on Display by anyone other than Lessor or Lessors' agent.

* * * * * *

"E5. This Agreement is binding upon and inures to the benefit of the successors and assigns of the parties hereto, but the interest of Lessee shall not be transferable through operation of law or otherwise without prior written consent of Lessor * * *."

██ Newsom contends and the Court of Civil Appeals held that Liberty was obligated by the provisions of Paragraph 5 to replace the signs after they were removed by Stecker on March 21. We do not agree. Although Stecker was not the agent of Newsom, he was the sole owner of and acting for the corporation. Newsom had sold his interest in the signs to the corporation, and the latter had assumed payment of the rent to Liberty. Under the provisions of Paragraph 5, Liberty was not obligated to restore the signs if they were damaged by the deliberate act of "Lessee or his agents." Paragraph E3 provides that without prior written consent of Liberty, "Lessee" shall not permit the signs to be replaced or

altered by anyone other than Liberty or its agents. The parties further agreed in Paragraph E5 that the lease would be binding upon their successors and assigns, but that Newsom's interest was not transferable without the written consent of Liberty.

If Liberty had consented to the sale of Newsom's interest, removal of the signs by the corporation would clearly be an act of the lessee within the meaning of Paragraph 5. See Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775. We are satisfied that the parties did not intend for Liberty to be under any greater duty if the signs were damaged or destroyed by one to whom Newsom had assigned without Liberty's consent. In our opinion the term "Lessee" as used in Paragraph 5 includes Newsom and anyone holding through and under him. The restriction on his right to assign was for Liberty's benefit, and could be waived by Liberty at any time. The assignment made in violation thereof was not void. We hold, therefore, that Liberty was under no duty to replace the signs and did not breach its contract by failing to do so. This does not mean that every reference to the lessee in a lease of real or personal property necessarily includes an assignee of the original lessee. That depends upon the nature of the provision, the purpose of its inclusion in the lease, and the circumstances under which the contract was made. See In re Clerc Chemical Corp., 3rd Cir., 142 F.2d 672.

■ Turning now to the question of election, Paragraph D of the lease gives Liberty the right to terminate the agreement at its option in the event of default in the payment of rent. It further provides that upon such termination the unpaid rent for the unexpired portion of the lease shall become immediately due and payable, and that lessee shall pay all such rents *and other amounts due lessor,* less 24% of unaccrued rentals, as liquidated damages. The rent for January, February and March had accrued and was unpaid when Liberty

elected to terminate the lease. It was then entitled under the provisions of Paragraph D to the rent for these three months plus 76% of unaccrued rents. The demand, suit for and acceptance of the $575.55 accrued rent was not inconsistent with and does not preclude Liberty's asserting its right to 76% of the unaccrued rents as liquidated damages.

■ There is another problem which was not reached by the Court of Civil Appeals. A printed form was used for the original contract dated August 14, 1964, and the figure "24%" was written by a typewriter in a blank left in the liquidated damages provision. A printed form was also used for the rider dated September 16, 1964. The latter contained a number of blanks which were completed by typewriter before the rider was signed. As executed by the parties, the rider reads as follows, with the typewritten portions shown in italics:

"* * * this rider shall become part of the *Rental* agreement above designated and previously entered into between the parties to this rider on the *14th* day of *August, 1964*. The original terms and conditions of the aforesaid contract shall remain in full force and effect, except as this rider shall change or alter them as follows:

* * * * * *

"Change in rates, if any (strike out if none):

"Monthly rate will be $191.85

"Monthly continuance rate will be $71.75

"Monthly rate in default clause will be $ 23%

"Other —————

"This rider shall become effective September 16, 1964."

Newsom contends that the effect of the rider was to provide that the liquidated damages would be 23% of the unaccrued rents. In the alternative he says the provision is so ambiguous as to render the

entire default provision void. The right to terminate upon default in the payment of rent is plainly granted, and when the rider is considered in the light of the circumstances under which it was executed we think the effect of its provisions is equally clear. The printed form used for the rider was prepared to enable the parties to make changes in the figures inserted in blanks in the original contract. The language of the rider is not entirely appropriate, because no *monthly* rate is stated in the default clause of the original contract. There is, however, only one blank in such clause and this blank was completed by inserting the percentage by which the unaccrued rents were to be reduced in computing liquidated damages. We think it is clear that the parties intended by the rider to change that figure from 24% to 23%.

 In Paragraph VII of its first amended original petition Liberty alleged that it had employed attorneys and agreed to pay them a reasonable fee in the amount of $1,500.00. The prayer was for the recovery of $8,723.72 with interest thereon from March 25, 1965, together with attorney's fees in the amount of $1,500.00, and for general relief. By trial amendment Paragraph VII of the petition was changed to allege that Liberty had employed attorneys and agreed to pay them reasonable fees for the preparation and trial of the case and for handling the cause on appeal. The amount of a reasonable fee was not alleged, and the prayer was not amended. In the course of the trial it was stipulated that a reasonable fee for the services rendered by Liberty's attorneys should be $1,750.00 through the trial court, an additional $500.00 in the event the cause was appealed to the Court of Civil Appeals, and an additional $500.00 if the cause was appealed to the Supreme Court of Texas.

The $1,500.00 figure stated in the prayer would ordinarily constitute a ceiling on the amount that could properly be awarded as attorney's fees. See Williams v. Wyrick, Tex.Civ.App., 242 S.W.2d 669 (affirmed, 151 Tex. 40, 245 S.W.2d 961). In view of the trial amendment and the stipulation of the parties in the present case, however, both parties as well as the trial court must have understood that Liberty was seeking and would be entitled up to $2,750.00 attorney's fees if its claim was established. We think that in these circumstances attorney's fees in the amounts stipulated were properly awarded under the prayer for general relief. There is no contention that the trial court could not make part of such award contingent upon an appeal. See Cooksey v. Jordan, 104 Tex. 618, 143 S.W. 141; Preferred Life Ins. Co. v. Dorsey, Tex.Civ.App., 281 S.W.2d 368 (wr. ref. n. r. e.).

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.