**ELLIOTT v. DODSON et al.    (No. 11828.)**

Court of Civil Appeals of Texas.    Fort Worth.
June 11, 1927.

Rehearing Denied July 16, 1927.

1. Landlord and tenant ⊚⇒75(3)—Assigning or subletting contract by tenant without consent of landlord is voidable at option of landlord; "subtenant"; "subletting" (Rev. St. 1925, art. 5237).

An assigning or subletting contract by a tenant without the consent of the landlord, his agent, or attorney is voidable at the option of the landlord, under Rev. St. 1925, art. 5237; "subtenant" being one who leases all or part of rented premises from an original lessee for a term less than that held by the original lessee, and "subletting" being a demise by lessee of the whole or a part of the premises for a portion of the unexpired term.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subtenant; Second Series, Subletting.]

2. Evidence ⊚⇒589—Trial court acting without jury might believe plaintiff's testimony rather than defendant's.

The trial court, sitting without a jury, had the right to believe plaintiff's testimony that defendant gathered one bale of plaintiff's tenant's cotton and to ignore defendant's testimony that he bought the bale of cotton after it was picked and on the wagon.

3. Landlord and tenant ⊚⇒326(2)—Under lease of farm reserving rental of one-fourth of cotton, where tenant sublet without authority, tenant could sell cotton where purchase occurred before landlord sequestered farm or indicated intention to forfeit lease.

Under lease of farm reserving to landlord one-fourth of cotton crop as rent, where tenant sublet without permission from landlord, tenant *held* to have had the right to sell the matured cotton and buyer to have had secured the right of ingress and egress to gather it, where purchase occurred before the landlord sequestered the farm or gave notice of his inten-

tion to forfeit the tenant's lease for the unauthorized subletting.

**4. Landlord and tenant ⬥252(1)—Purchaser from tenant of matured cotton crop has right to gather it and to sell it subject to landlord's lien for rent and advances.**

One who purchases from a tenant a matured cotton crop secures the right to gather the crop and to sell it subject to the landlord's lien for rent and advances and the right of ingress and of egress for the purpose of doing so.

**5. Landlord and tenant ⬥330(1)—Purchaser from tenant of matured cotton crop is liable for damages to premises caused in gathering crop.**

If one purchasing a matured cotton crop from a tenant causes any damages to the premises while gathering the crop, he is liable therefor.

**6. Landlord and tenant ⬥326(2)—Tenant agreeing to pay rental of one-fourth of cotton had title to three-fourths on maturity.**

Tenant had title to three-fourths of cotton crop when it matured, where the rental contract provided for a rental of one-fourth of the cotton crop.

**7. Landlord and tenant ⬥330(1)—Where purchaser of cotton from tenant having title to three-fourths deposited one-fourth of proceeds to landlord's credit, he was not liable for more than that sum.**

Where tenant had title to three-fourths of matured cotton, and purchaser of the cotton deposited one-fourth of the proceeds of his sale of the cotton to the credit of the landlord, *held* that the purchaser was not liable to the landlord for any greater amount.

**8. Crops ⬥1—Growing crops before maturity are considered as realty.**

As a general rule, growing crops before they are matured are considered as being realty.

**9. Landlord and tenant ⬥329—Landlord was entitled to writ of possession, where tenant sublet without permission.**

Where a tenant sublet a portion of the premises to another without landlord's consent, the landlord was entitled to writ of possession and to judgment thereon against the tenant and against the subtenant.

Appeal from District Court, Knox County; J. H. Milam, Judge.

Suit by E. P. Dodson against C. R. Elliott and another, in which named defendant brought a cross-action. From a judgment in favor of plaintiff the named defendant appeals. Affirmed in part and in part reformed, and, as reformed, affirmed.

J. S. Kendall, of Munday, for appellant.
D. J. Brookreson, of Benjamin, for appellees.

BUCK, J. E. P. Dodson rented a farm of about 120 acres, situated in Knox county, a

mile and one-half from the town of Munday, for agricultural purposes, to G. A. Moore, for the year 1923, at a rental of one-third of the grain crop and one-fourth of the cotton crop. Moore planted about 90 acres in cotton and about 25 acres in maize. Some time during the latter part of November, 1923, Moore sublet or assigned the land where the maize had been planted, and after the heads had been cut off, to C. R. Elliott for pasturage purposes. When Dodson heard of this deal, he went to see Elliott, who told him that he had made a trade with Moore for the maize stalks and intended to pasture the land. Dodson protested against the use of his land for pasturage purposes, but Elliott told him that he had rented the land from Moore and to go and see him. Dodson then went out to the farm and found that there had been constructed a two-wire fence around the maize land and Elliott had some 25 head of mules and horses on it. Later, Elliott bought the remnant of the cotton crop from Moore and picked or bought one bale, already picked, which he sold and put one-fourth of the proceeds therefrom in the bank to Dodson's credit. This amounted to some $33.68. But Dodson did not accept the deposit made in lieu of rental, and returned the amount to Elliott. Five days after his conversation with Elliott, Dodson filed suit against Moore for possession of the land, and sequestrated it. In this suit he sought a termination of the lease or rental contract between him and Moore, and prayed for possession of the premises. He had issued a writ of sequestration prior to the final judgment, and the sheriff had taken possession of the farm. He made Elliott a party defendant and alleged that through the pasturage of his land by Elliott's mules and horses, and damage done to his fences and watering troughs, the land had been depreciated in value for farm purposes in the amount of $1,000. He prayed for the value of the bale of cotton sold by Elliott, evidently on the theory that Elliott had acquired no title to said cotton while in the field, by reason of his contract with Moore, and that he had no right to take possession thereof or sell the cotton. The cause was tried before the court without the intervention of a jury, and the court rendered judgment for plaintiff against the defendants Moore and Elliott for the title and possession of the farm. Judgment was also rendered for plaintiff and against Elliott in the sum of $134.75, evidently the reasonable market value of the bale of cotton sold by Elliott, though in plaintiff's petition he alleged the value of the bale of cotton to be $134.72. From this judgment Elliott has appealed.

Opinion.

[1] Article 5237 of the Revised Statutes of 1925, is as follows:

"A person renting said lands or tenements shall not rent or lease the same during the term of said lease to any other person without first obtaining the consent of the landlord, his agent or attorney."

This statute has been construed a number of times, and the courts hold that an assigning or a subletting contract by a tenant, without the consent of the landlord, his agent, or attorney, is voidable at the option of the landlord. Birchfield v. Bourland (Tex. Civ. App.) 187 S. W. 422, by this court, opinion by Justice Dunklin; G. C. & S. F. Ry. Co. v. Settegast, 79 Tex. 256, 15 S. W. 228; Dodson v. Moore, 272 S. W. 263, on a former appeal of this case, decided by the Court of Civil Appeals at Amarillo, and cases cited in both the majority and minority opinions. A "subtenant" is one who leases all or a part of rented premises from an original lessee for a term less than that held by the latter, and "subletting" is where lessee demises the whole or a part of the premises for a portion of the unexpired term. Hudgins v. Bowes, 110 S. W. 178, by the Dallas Court of Civil Appeals; 18 Amer. & Eng. Enc. Law (2d Ed.) 658.

[2, 3] The evidence tends to show that Elliott purchased the remnant of the cotton crop before the writ of sequestration, and before Dodson had informed him or Moore that he would elect to forfeit the lease by reason of the alleged unauthorized subletting. Elliott testified in part as follows:

"I talked to Mr. Dodson about buying that cotton crop some time in the latter part of November. That conversation was had in Munday, Tex., right near the Camel Mercantile Store. He asked me what kind of a trade old man Moore and I were making, and I told him that I started to buy the teams and wagons and tools from him, and that I had about bought everything he had. As to whether or not that was before or after I had bought the cotton crop, will say, I really made two or three trades with the old man. I think it was before I bought the cotton crop. He told me that he had sold the place to Mr. Burnison, and he was kicking about it. I says, 'You go and talk to him [evidently Mr. Moore] about it. I bought it from him and bought it in good faith.' He did not forbid me to buy the cotton crop. At that time I had already got the lease on the maize patch. I did that before I bought the cotton crop. At the time I had the conversation with Mr. Dodson, I was negotiating with Mr. Moore about buying the cotton crop. I told him that I had about bought the old man out. He did not tell me that he forbid me buying the crop. The purchase of the cotton crop was not made in the same transaction as the maize patch. He did not sell me any rights around the premises. I did not have anything to do with that. I did not have possession of any of the buildings or anything like that."

On cross-examination he testified:

"He did not sell me any rights to use the buildings. I used the lots there. There was a little tank there in the field. He [evidently meaning Moore again] moved out and left. I have not seen him any more since that time. As to whether or not Mr. Dodson told me not to put the stock in there, will say he was not objecting; he said that Burnison was kicking up about it. He told me that he had a contract with Burnison and that he wanted to satisfy him about it. He did not tell me that he was going to keep the stock out of there if he could. He did not say anything like that to me at all. I did not take the stock out until the sheriff came out there. It rained, and I went out there and took them out of the field and shut them up in the lot. At the time I purchased the cotton crop G. A. Moore was in possession of the premises. He was living there at the time. He was gathering the cotton, and he had one bale on the wagon, and I bought that bale and the wagon and everything he had. The pickers were turned over to me. I never did get any more cotton picked. The sheriff came out there and sequestrated it."

The plaintiff Dodson testified in part as follows:

"I did notice some changes being made on the premises during that year. I was notified that there was some changes being made and I went there to see. I noticed that there had been a fence built around the maize patch; that was the only change that had been made at that time. That was the first time that I knew anything about any changes being made on the premises. The maize patch is in the southeast corner of the field, and he had put two wires around it, fencing the maize patch off from the cotton. When I observed that condition, I asked Mr. Moore what he had fenced it for, and he said that he leased it to Mr. Elliott until January 1st. He said he had leased it until the following January. As to whether or not he had ever asked me before that if he could lease that land, will say he had never mentioned it to me at all. I told him that I had sold that land to Mr. Burnison, to be delivered January 1st, and that I did not figure it would be in good condition if he pastured the land, and that the land was supposed to be in good condition at the time I turned it over to Mr. Burnison. He told me that he had already made the trade and that he could not revoke it. I had already seen Elliott, and I went back to town and saw him the same day again and protested to him again. I told him I did not want the fence there, and would not have it there if I could prevent it. He said that he had leased it and that he was going to put stock in it. As to whether or not I forbid him to do that, will say I certainly did. After that I filed suit for possession of the premises. The next time after that that I saw the land was four days, I believe, afterward. This was on the 29th of November that I went there. I saw Mr. Moore and Mr. Elliott two or three times and tried to prevent him from carrying the contract out. I then got you [the attorney] to help me. The next time I was out there, I saw some stock in the field. I counted 25. There might have been more. There is a little swag in the field, and you can't see all over it. They were mules and horses. * * * I saw Mr. Moore there that time. He was moving his things out of the house. He had already moved a good many things, and I was under the impression that he was getting his last things out of the house that time. I did not talk to him at that

time. * * * I was under the impression that he went to California, but I do not know that of my own knowledge. He did not come back out there any more that I know of. That day, the 4th day of December, was the first that I ever knew that Mr. Elliott was claiming an interest in the cotton. Mr. Moore never did tell me that he was going to, or ask my permission, to sell any cotton, or any part of cotton, on that farm. As to whether or not I told him I did not want him to sell any of the cotton on that place, will say he never intimated to me that he wanted to sell any. I told him I did not want the maize patch pastured. * * * Mr. Elliott gathered one bale off of that land before I sequestrated it. He sold that bale for $134. He gave me my interest on the bale. He put it in the bank for me, but I turned it back to him. As well as I remember, my part was thirty three or four dollars. As to whether or not it was $33.68, will say, I believe it was. * * * I went to the lawyers, and left the remedy to them. I left it all to the lawyers. * * * I told the lawyers that I wanted to put the stock off of my premises. I stated the case to them, and they suggested the remedy."

Mr. Burnison, a witness for the plaintiff, testified in part as follows:

"I own the piece of land that is in controversy. I had made a contract with Mr. Dodson before this trouble ever came up to buy the land 'from him. I never did mention to Mr. Dodson that I might buy the cotton crop. I did not have any intention of buying it. I had a crop myself. I did not intend to buy the crop."

On being recalled, he further testified:

"I was present in Munday, Tex., when Mr. Dodson and Mr. Moore had a conversation about these mules and horses being turned in the maize patch. At that time Mr. Elliott did not say anything to Mr. Dodson about buying the cotton crop out there. Mr. Dodson told him that he did not want them in there; that he had a contract with me. As to whether or not he forbid him to put them in there, will say he said he was going to stop it if he could."

On cross-examination he testified:

"Mr. Dodson did not tell Mr. Elliott in that conversation that he was going to put old man Moore off of the premises. As to whether or not he forbid Mr. Elliott to buy the crop that day, will say there was not anything mentioned there about him buying the crop. As to whether or not Mr. Moore was still on the premises at the time that conversation took place, will say he was on the place that day."

That above is substantially all the testimony in any way relating to the matter of a forfeiture by plaintiff of his rental contract with Moore, and as to whether by word or action he informed either Moore or Elliott that he was going to forfeit the rental contract by reason of the unauthorized assignment. or subletting by Moore to Elliott of the maize patch.

It will be noted that the trial court did not award damages for injury to the land. There is no evidence as to the amount of such dam-ages, if any. On the former appeal, the majority of the Court of Civil Appeals at Amarillo, in discussing this matter, said that the evidence showed that Dodson recovered the amount Burnison had promised to pay him for the land, and that the trial court probably concluded that Dodson had not suffered any damages to the land.

[4-8] We conclude that Moore had the right to sell the crop of cotton matured in the field to Elliott, and that Elliott had the right of ingress and egress to gather it, giving full force to Dodson's testimony that Elliott gathered one bale, and ignoring Elliott's testimony that he bought this bale after it was picked and on the wagon, which the trial court had the right to do. At any rate, the cotton had been picked before the sequestration, for Dodson so testified. A purchaser from a tenant of a matured cotton crop has the right to gather it and sell it subject to the landlord's lien for rent and advances and the right of ingress and egress to so do. Of course, he is liable for any damages to the premises while gathering the crop, but no damages were allowed in the instant case. See Davis v. Goldberg, 75 Tex. 49, 12 S. W. 952, by the Supreme Court. The cotton having matured, the tenant had title to three-fourths thereof, whether he picked it with his own force or hired it picked; and in case he sold the matured crop, the purchaser would be entitled to such three-fourths. We think that Elliott, in depositing in the bank one-fourth of the balance of the cotton sold, to Dodson's credit, did all that under the law was required of him. As a general rule, growing crops, before maturity, are considered as realty. Horne v. Gambrell, 1 White & W. Civ. Cas. Ct. App. § 996; Hardeman v. State, 16 Tex. App. 1, 4, 49 Am. Rep. 821; Missouri-Pacific Ry. Co. y. Cullers, 81 Tex. 382, 17 S. W. 19, 13 L. R. A. 542; 1 Schouler on Personal Property, 123 et seq.; Freeman on Executions, § 113; see Vol. 5, Enc. Dig. of Tex. Reports, under the head of "Crops"; 29 R. C. L. 72, § 51.

[9] Dodson was entitled to his writ of possession, and a judgment thereon, as against Moore and Elliott, and the judgment of the trial court in this respect is affirmed.

While Elliott in his cross-action prayed for damages against Dodson in the amount of $900, yet he proved no further damages than were involved in the judgment rendered. Therefore it becomes our duty to reform the judgment and here enter judgment which should have been entered by the trial court. The judgment allowing plaintiff a recovery for $134.75 against Elliott is reformed so as to allow a recovery for only $33.64, one-fourth of the value of the bale of cotton sold, and, as reformed, is affirmed. The costs of this appeal incurred by appellant are adjudged against the appellee Dodson.

Affirmed in part, and reformed and affirmed in part.