## TWELVE OAKS TOWER I, LTD., Appellant,

v.

## PREMIER ALLERGY, INC., Appellee.

### No. 14–95–00685–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 12, 1996.

Rehearing Overruled Feb. 20, 1997.

John Christopher Dunne, Michael J. Mazzone, Houston, for appellant.

Laura J. Ware Doerre, Solace H. Kirkland, Houston, for appellee.

Before EDELMAN, O'NEILL and DRAUGHN *.

## OPINION

JOE L. DRAUGHN, Justice (Assigned).

This appeal arises from a dispute concerning a lease. The appeal is from the trial court's judgment in favor of Twelve Oaks Tower I, Ltd. (Twelve Oaks) under which Twelve Oaks recovered $18,333.47 in rent and other charges due under the lease from Premier Allergy, Inc. (Premier). Though it recovered in the trial court, Twelve Oaks brings this appeal complaining about the judgment. Additionally, Premier brings two cross-points challenging the trial court's judgment. We reverse and remand.

In 1988, Twelve Oaks Associates, Ltd. and Dr. Mathew D. Burnett entered into a lease agreement whereby Dr. Burnett agreed to lease a suite in the Twelve Oaks Medical Tower from July 10, 1988, through July 10, 1994. Under the terms of the lease, Dr. Burnett was to use the suite as offices for an allergy clinic.

In March of 1991, the Federal Deposit Insurance Corporation (FDIC) foreclosed on Twelve Oaks Medical Tower. According to Twelve Oaks, the FDIC became the owner and landlord under the lease. However, Premier argues that for the lease to have survived the foreclosure, notice had to be given to Dr. Burnett of the FDIC's intention to "deem the Lease prior to its lien," and there is nothing in the record showing Dr. Burnett received such notice. Dr. Burnett did, however, pay rent to the FDIC during the time the FDIC owned Twelve Oaks Medical Tower.

Later in 1991, Dr. Burnett and Premier entered into an Asset Purchase Agreement, effective June 1, 1991, under which Premier purchased substantially all of the assets of Dr. Burnett's allergy practice. Under the agreement, Dr. Burnett was to assign his interest in the lease to Premier; however, Premier claims that, although it agreed to continue forwarding checks for rent payment, it never actually assumed the lease because there was no consent from the landlord as required under the agreement. Though Premier never actually took over the lease, it paid rent, took possession of the suite, and had the new clinic name, Allergy and Asthma Centre of Houston, put on the door to the suite and on the building directory. The FDIC accepted rent payments from Premier. As for Dr. Burnett, he became an employee of Premier under an employment agreement.

On October 24, 1991, Dr. Burnett died. Premier continued to occupy the suite at Twelve Oaks Medical Tower and continued to

* The Honorable Former Justice Joe L. Draughn sitting by assignment.

pay rent. In July of 1992, Twelve Oaks purchased the medical tower from the FDIC. Premier began making rent payments to Twelve Oaks, and Twelve Oaks accepted them. Premier claims it tried for months to make a go of the allergy clinic without Dr. Burnett; however, Premier admits it became apparent that the allergy clinic was not viable without Dr. Burnett. So, in a letter dated August 31, 1992, Premier advised Twelve Oaks:

> [W]e are giving you (30) days notice on our lease with you. September 30, 1992 we will be vacating the premises at 1500 Twelve Oaks Tower, 4126 Southwest Freeway.... We are also requesting at this time for the refund of our deposit in the amount of $2,918.62.

Premier stopped paying rent after September and vacated the suite. On September 9, 1992, Twelve Oaks' attorneys sent Premier a letter challenging its right to terminate the lease. The letter stated the attorneys could find no basis, in law or fact, to support Premier's belief that it could terminate the lease on thirty days notice. The letter also asked Premier to inform the attorneys of the basis on which Premier believed it could terminate. Ultimately, Premier propounded two theories on which it claimed it could terminate the lease: (1) the FDIC foreclosure terminated the lease, and thereafter, Dr. Burnett and Premier occupied the premises on a month-to-month tenancy; or (2) the "death and disability" clause terminated the lease.

On December 1, 1992, Sandra L. Burnett, the executrix and widow of Dr. Burnett, sent a letter to Twelve Oaks stating it was her belief that the lease terminated, by its terms, upon her husband's death. On January 25, 1993, an attorney for Mrs. Burnett sent a second letter to Twelve Oaks stating that the December 1, 1992, letter was a termination of the lease to be effective on December 30, 1992. Twelve Oaks rejected Mrs. Burnett's termination notices and filed suit against Premier and Mrs. Burnett in her capacity as executrix of the Estate of Mathew D. Burnett, M.D.

Twelve Oaks alleged Premier and Dr. Burnett breached the lease. Premier answered, cross-claimed, and counterclaimed. Before opening statements, Mrs. Burnett and Twelve Oaks non-suited their claims against each other; these claims are not part of this appeal. Additionally, Premier settled with Burnett's estate for $12,500.00; these claims are also not part of this appeal. Twelve Oaks' claim against Premier proceeded to a jury trial. The jury found: (1) Dr. Burnett and Premier agreed to an assignment of the lease; (2) the lease was terminated on December 1, 1992; and (3) reasonable attorney's fees for Twelve Oaks were $12,637.50 for trial, $3,212.50 for an appeal to the court of appeals, $1,000.00 for making or respond to an application for writ of error to the supreme court, and $1,000.00 if application for writ of error is granted by the supreme court.

Twelve Oaks moved for judgment on the jury's verdict, but asked the court to disregard the jury's answers to the questions on the termination of the lease; the trial court entered judgment, but refused Twelve Oaks' request to disregard the jury's answers on termination. Premier asked the court to deny Twelve Oaks' motion for entry of judgment and grant judgment in favor of Premier for the amount of the security deposit; the court refused. In its judgment, the trial court ordered that Twelve Oaks recover $18,333.47 from Premier, plus pre- and post judgment interest. The court stated the amount of recovery represented rent and other charges due under the lease upon termination effective December 31, 1992. As to the attorney's fees, the trial court reduced the amounts found by the jury and awarded Twelve Oaks $3,033.39 for trial, but refused to award any appellate attorney fees. Both parties appeal from the judgment.

Twelve Oaks has raised twelve points of error and Premier has raised two cross-points. Because Premier's cross-points concern the initial question of the validity of the assignment, we shall address them first.

■ In its first cross-point, Premier claims the trial court erred in entering judgment in favor of Twelve Oaks because the foreclosure on the property by the FDIC in 1991 terminated the lease as a matter of law. Thus,

Premier claims that after foreclosure, its occupancy was nothing more than a tenancy at will which was terminable at will by either Premier or Twelve Oaks. In support of its position that the foreclosure terminated the lease and thereafter only a tenancy at will existed, Premier cites *ICM Mortgage Corp. v. Jacob*, 902 S.W.2d 527 (Tex.App.—El Paso 1994, writ denied). While we agree that the lease terminated when the FDIC foreclosed on the property in 1991, we do not agree that a tenancy at will was created following the foreclosure.

■ When a tenant's landlord-mortgagor is foreclosed upon by the landlord's mortgagee, the tenant's lease is ordinarily terminated. *Id.* at 530 (citing *B.F. Avery & Sons' Plow Co. v. Kennerly*, 12 S.W.2d 140, 140–41 (Tex.Comm'n App.1929, judgm't adopted); *Gainesville Oil & Gas Co. v. Farm Credit Bank of Texas*, 847 S.W.2d 655 (Tex.App.—Texarkana 1993, no writ); *Bateman v. Brown*, 297 S.W. 773 (Tex.Civ.App.—Amarillo 1927, writ dism'd)). The *Jacob* court initially characterized termination following foreclosure as a "general" occurrence because it recognized that certain Texas case-law seemed to pronounce a contrary rule. 902 S.W.2d at 530.

In *Lockhart v. Ward, Dewey & Co.*, 45 Tex. 227, 228 (1876), Lockhart, the purchaser of property at a foreclosure sale, sued to evict a tenant from the property he purchased. The Texas Supreme Court held that a tenant is a necessary party to a foreclosure action against his landlord, and therefore, the tenant could assert his right to redeem against the purchaser at his first opportunity, i.e., the suit to evict him. *Id.* at 231. Oddly enough, after stating this rule and noting the tenant's desire to redeem, the court awarded the property to Lockhart. *Id.* The court's actions could be interpreted to mean that the failure to join the tenant as a party to the foreclosure merely meant that the foreclosure proceedings did not conclusively determine the tenant's rights, not that the tenant actually had any greater rights. *See Jacob*, 902 S.W.2d at 531.

In *Kennerly*, a case with similar facts, the court, citing *Lockhart*, noted that a tenant's rights *were not* determined when his landlord's mortgagee foreclosed. *Kennerly*, 12 S.W.2d at 140–41. However, the court then held that the foreclosure sale purchaser received a title *free* from the obligations of the lease and was entitled to immediate possession of the property. *Kennerly*, 12 S.W.2d at 140–41. Though citing *Lockhart* for the contrary proposition, the *Kennerly* court, by holding that the foreclosure sale purchaser received a title free from the lease, implicitly held that foreclosure did determine the tenant's rights. Further, the *Kennerly* court went further than the *Lockhart* decision and expressly found the lease terminated by the foreclosure sale. *Id.* Therefore, even if the *Lockhart* court meant to hold that a tenant can enforce a lease against a foreclosure sale purchaser, that holding was implicitly overruled when the court adopted the Commission of Appeals' decision in *Kennerly* and left the rule that a foreclosure effects a termination of the lease.

Though the rule seemed simple, it was complicated by the court's opinion in *Peck & Hills Furniture Co. of Texas v. Long*, 68 S.W.2d 288 (Tex.Civ.App.—Fort Worth 1934, no writ). In that case, a subtenant sought to avoid a judgment in favor of the foreclosure sale purchaser for rent due under the original tenant's lease with the mortgagor. *Id.* at 289. The court held that the foreclosure:

> ... gave the right to the purchaser to either terminate the lease or to continue it in force with the tenants' consent. If, subsequently [sic] to the foreclosure, the purchaser and the lessee and the ... subtenant elected to treat the lease as still subsisting and thereafter rents were paid by [the subtenant] with full knowledge of the foreclosure sale, in accordance with the terms of the original lease ... then there was an implied agreement between the [purchaser and the subtenant] for a continuation of the lease as originally made upon the same terms, with the [purchaser] substituted as landlord in place of ... the original lessors.

*Id.* at 289–90. Thus, under *Peck & Hills*, the foreclosure did not automatically terminate the lease. Rather, the foreclosure sale purchaser could terminate the lease, or, if the tenant consented, the foreclosure sale pur-

chaser could "continue" the lease. *Id.* The court's failure to cite *Kennerly* created some confusion among the courts.

The first case to attempt to reconcile the confusion was *United General Ins. Agency of Midland, Inc. v. American Nat'l Ins. Co.,* 740 S.W.2d 885 (Tex.App.—El Paso 1987, no writ). In that case, relying on an extract from a treatise on Texas Foreclosure law and *Peck & Hills,* the court held that the foreclosure sale gave the purchaser the right to terminate or continue the lease, but did not of necessity terminate the lease. *Id.* at 887. Because the tenant did nothing more than continue in possession after the foreclosure, the court found the tenant was not bound to the lease. *Id.* The court did not explain under what circumstances a lease would be held to continue following foreclosure.

Finally, in *ICM Mortgage Corp. v. Jacob,* 902 S.W.2d 527 (Tex.App.—El Paso 1994, writ denied), the court had an opportunity to explain itself and to settle the apparent discrepancies created by the *Kennerly, Peck & Hills,* and *United General* decisions. In *Jacob,* the Arkuses purchased a piece of property and assumed liability under a note and deed of trust held by ICM Mortgage (ICM). 902 S.W.2d at 528. A month later, the Arkuses leased the property to Jacob. *Id.* Approximately six months later, ICM foreclosed on the property because the Arkuses failed to make their payments on the note. *Id.* After the foreclosure sale, ICM inspected the property and found the property occupied; however, ICM believed the Arkuses were on the property because the company did not know about the lease to Jacob. *Id.* ICM commenced a forcible entry and detainer action. *Id.* Jacob contacted the attorney representing ICM and expressed her desire to remain on the property and ultimately purchase it. *Id.* at 529. The attorney referred Jacob to ICM's Denver office. *Id.* Jacob ultimately contacted the Denver office and the manager of ICM's Houston office and expressed her interest in the property. *Id.*

ICM failed to reply to Jacob's request before judgment was entered in favor of ICM in the forcible entry and detainer action. *Id.* After the judgment was entered, but without any knowledge of what had occurred, Jacob contacted the Denver office several times. *Id.* Her contact in the Denver office told her to sit tight, and when Jacob offered to continue paying rent to ICM, she was told ICM could not accept rent from Jacob until it had clear title to the property. *Id.* Ultimately, ICM obtained a writ of possession from the court and when appellee returned home one evening, she found the locks on the doors had been changed and her possessions had been removed. *Id.* Two weeks later, ICM told Jacob for the first time that she should make an offer for the property. *Id.* at 530.

Jacob sued ICM for negligence in obtaining and executing a forcible entry and detainer judgment. *Id.* 528. The jury found in favor of Jacob and awarded her damages. *Id.* ICM appealed and argued that judgment should not have been entered in favor of Jacob because she was merely a tenant at sufferance after the foreclosure. *Id.* at 530. Jacob countered that she was a tenant at will. *Id.* Jacob, relying on the language in *United General* that the purchaser could terminate the lease or could continue it with the tenant's consent, argued that she did have a landlord-tenant relationship with ICM because ICM took no action to terminate her lease. *Id.* at 532.

In response to her argument, the court concluded that while a cursory reading of *Peck & Hills* and *United General* might seem to contravene the general rule that a foreclosure terminates a tenant's lease, a careful examination of those cases shows that the apparent contradiction arises from confusion over the use of the word "continue" and the cases are in fact faithful to the *Kennerly* rule. *Id.*

While the rule from *Kennerly* does state that a tenant's lease ends upon foreclosure, nothing in the opinion prohibits the tenant and the foreclosure sale purchaser from independently entering into a new landlord-tenant relationship. *Id.* If it did, it would amount to an infringement on the parties' freedom to contract. *Id.* Thus, while not citing *Kennerly* or referring to its rule, *Peck & Hills* and *United General* did not contradict it, but merely recognized that after foreclosure terminates the lease, the parties have the freedom to enter into a new contractual

relationship. *Id.* Despite the fact that *Peck & Hills* and *United General* used the words "continue" and "continuation," when referring to the lease, the *Jacob* court construed those cases as referring to a landlord-tenant relationship that is independent of the original lease. *Id.* Thus, the fact that a foreclosure sale terminates a lease does not erect a legal barrier to the formation of an independent landlord-tenant relationship between the tenant and the foreclosure sale purchaser. *Id.* at 532–33. The fact that the parties are held to the terms of the previous lease does not alter this conclusion. *Id.* at 533. It is merely the origin of the new contractual relationship that is independent of the prior lease, not the substance of the relationship. *Id.* If the parties are capable of independently entering into a new relationship, they are equally capable of electing to model it after the terms of a known instrument, i.e., the previous lease. *Id.* This allows for the reasonable inference that because a contractual agreement is implied between the parties, it is prudent to look to an existing instrument to which at least one party had previously assented to establish the terms of the implied agreement. *Id.*

In *Jacob,* the court, based on the reasoning set out above, found that the foreclosure sale conclusively terminated the lease, and the parties' post-foreclosure conduct had to be analyzed to determine whether a new lease was created, the terms of which would be supplied by the previous one. *Id.* Unfortunately for Jacob, ICM repeatedly refused to accept her offer to pay rent. *Id.* The indefinite instructions to "sit tight" were held to be insufficient as a matter of law to give rise to a new lease between Jacob and ICM. *Id.* Thus, the court held there was no landlord-tenant relationship between the parties after the foreclosure. *Id.* at 533–34.

■ We agree with the reasoning and analysis used by the Eighth Court of Appeals in *Jacob.* Therefore, while the foreclosure did in fact terminate the lease between Dr. Burnett and Twelve Oaks, we must look at the post-foreclosure conduct of the parties to determine whether a new lease, with terms supplied by the previous one, was created by implication. *See id.* at 533. *See also Kennerly,* 12 S.W.2d at 140–41; *Peck & Hills,* 68 S.W.2d at 289–90.

In 1988, Dr. Burnett entered into the lease agreement with Twelve Oaks. In March of 1991, the FDIC foreclosed and became the owner of the property. Mrs. Burnett testified that "it was common knowledge in the building that the building had been foreclosed on." She testified that after the foreclosure, she continued to make rent payments up until the time Premier took over payment of the rent. According to the record, those payments went to the landlord, who was at the time, the FDIC. Then, once Twelve Oaks repurchased the property, Premier continued to make rental payments until it gave notice and left the property. Under these facts, we hold that while the foreclosure terminated the Lease, the parties' post-foreclosure conduct, including continued possession of the premises and payment and acceptance of rent payments with full knowledge of the foreclosure, created a new lease, the terms of which were the same as the previous one. Thus, while the Lease technically terminated at the time of the foreclosure, a new landlord-tenant relationship was created and Premier was not simply a tenant at will. We overrule cross-point one.[1]

■ In its second cross-point, Premier contends the trial court erred in entering judgment in favor of Twelve Oaks because there was no assignment of the Lease from Dr. Burnett to Premier as a matter of law. Premier argues that it wanted to accept an assignment of the Lease, but it did not because no landlord ever consented to the assignment and the Lease provided that any assignment required the landlord's consent. Premier also argues the assignment was invalid because it was not in writing and therefore, violated the statute of frauds.

First, any claim by Premier that it did not accept the assignment is without merit.

---

1. Twelve Oaks also argues that Dr. Burnett and/or Premier contractually attorned to Twelve Oaks. Because we have determined the lease relationship continued between the parties based on caselaw concerning foreclosure and renewal of lease relationships, it is unnecessary to address this contention.

While the Asset Purchase Agreement between Dr. Burnett and Premier required the landlord's consent to an assignment, Premier executed that agreement with full knowledge that the landlord had never consented to the assignment. The only time Premier told Dr. Burnett that it would not assume the Lease was in a letter written on August 7, 1991. However, in the letter, Premier's president and CEO did not state that Premier would never assume the Lease, he merely stated that Premier would not assume the Lease at that time. This letter was written before the execution of the Asset Purchase Agreement in which Premier agreed to assume *all liabilities under the Lease* after June 1, 1991. Thus, while Premier might have been concerned about the consent issue on August 7, its concern was relieved and a decision was made to enter the Asset Purchase Agreement and assume the Lease liabilities.

Under the principle of quasi-estoppel, a party is precluded from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken. *Enochs v. Brown*, 872 S.W.2d 312, 317 (Tex. App.—Austin 1994, no writ); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.—Texarkana 1992, writ denied); *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ). *See also* 31 C.J.S. *Estoppel* § 107 (1964), The doctrine applies where it would be unconscionable to allow a party to maintain a position inconsistent with one in which it acquiesced, *or of which it accepted a benefit*. *Id.* Quasi-estoppel is in essence a term applied to certain legal bars such as ratification, election, acquiescence, waiver, or acceptance of benefits. *See Steubner Realty*, 817 S.W.2d at 164 (citing 31 C.J.S. *Estoppel* § 107 (1964)).

In *Steubner Realty*, Cravens Road 88, Ltd. owned a tract of land in Missouri City that it wanted to sell. 817 S.W.2d at 162. Fincher, a general partner in Cravens Road, ultimately negotiated a sale with Aramburo, a general partner of Steubner 19, Ltd. *Id.* Before the sale, Aramburo was informed that Missouri City required dedication of a 120–foot easement before any platting, subdivision, or building permits would be issued. *Id.* Aramburo notified his partners about the easement and tried to negotiate with Missouri City for payment for the easement rather than donation. *Id.* Though Missouri City refused the request, the deal between Cravens Road and Steubner 19 was consummated by an earnest money contract. *Id.* After the sale, Aramburo learned that the easement extended onto property still owned by Cravens Road, and that his company could not develop the property unless Cravens Road agreed to dedicate part of its land for the easement. *Id.* Steubner 19 did not make its first payment and foreclosure occurred. *Id.* Steubner 19 then filed suit alleging fraud and negligent misrepresentation. *Id.* At trial, the jury was asked about and found quasi-estoppel. *Id.* at 163–64. On appeal, this court upheld the jury's finding, noting that Steubner 19 knew of the drainage easement, and that it got a reduced price because of it. *Id.* at 164. We held that because Steubner 19 knew of the easement, quasi-estoppel operated to bar Steubner 19, after purchasing the property, from taking the inconsistent position of claiming no knowledge of the impediment to development. *Id.*

In this case, Premier, a party which knew about the consent requirement but went ahead with the Asset Purchase Agreement and availed itself of the benefits of the lease for over a year, may not challenge the validity of the Lease when it clearly received a benefit from it. Premier occupied the premises, put its name on the door and the building directory, serviced patients, received payment from patients, and paid rent under the Lease for over a year. We find it cannot now claim there was never an assignment from Dr. Burnett.

As for Premier's argument that the assignment was invalid because the landlord never consented to the assignment as required by the Lease, this argument is not Premier's to make.[2] An assignment of a

---

2. Even if the Lease had not contained a provision requiring the landlord's consent to assign, the Texas Property Code states that a tenant may not rent the leasehold to any other person without the prior consent of the landlord. Tex.Prop.Code Ann. § 91.005 (Vernon 1995). This provision

lease in violation of the statute prohibiting assignments without consent and/or a lease provision prohibiting the same does not invalidate the lease or relieve the lessee or assignee who assumes them from the obligations imposed by the lease. *Reynolds v. McCullough*, 739 S.W.2d 424, 432 (Tex.App.—San Antonio 1987, writ denied) (citing *Nelson v. Seidel*, 328 S.W.2d 805, 807 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.)). It is well established that a provision in a lease prohibiting assignment without the landlord's consent is a provision for the landlord's benefit and may be waived by the landlord. *Liberty Sign Co. v. Newsom*, 426 S.W.2d 210, 214 (Tex.1968); *Jackson v. Knight*, 194 S.W. 844, 846 (Tex.Civ.App.—Amarillo 1917, writ ref'd); *Fair West Building Corp. v. Trice Floor Coverings*, 394 S.W.2d 707, 708 (Tex. Civ.App.—Fort Worth 1965, no writ); *Casto v. Johnson*, 392 S.W.2d 591, 593 (Tex.Civ. App.—Waco 1965, writ ref'd n.r.e.). In other words, a tenant's failure to obtain the required consent does not render the assignment void, rather, it is voidable at the option of the lessor. *Elliott v. Dodson*, 297 S.W. 520, 522 (Tex.Civ.App.—Fort Worth 1927, no writ); *Scott v. Slaughter*, 35 Tex.Civ.App. 524, 80 S.W. 643, 645 (Tex.Civ.App.—Dallas 1904, writ ref'd). The lease does not terminate unless the landlord undertakes to terminate it or declare a forfeiture or reenter. *Reynolds*, 739 S.W.2d at 432. Furthermore, because the provision is for the landlord's benefit, only he may complain of the wrong done by such assignment. *Young v. De La Garza*, 368 S.W.2d 667, 671 (Tex.Civ.App.—Dallas 1963, no writ); *Apperson v. Shofner*, 351 S.W.2d 367, 368 (Tex.Civ.App.—Waco 1961, no writ).

■ In this case, the only two parties with landlord status were the FDIC and Twelve Oaks. Neither of these parties complained at the time or now that Premier had assumed the lease and was occupying the property and paying the rent. Moreover,

even if Twelve Oaks did complain that there was no assignment because as lessor it had not consented, such complaint would be waived. A lessor waives its right to forfeit a lease for a tenant's failure to obtain consent before assigning or subleasing if it accepts rents after the assignment or sublease. *Nardis Sportswear v. Simmons*, 147 Tex. 608, 218 S.W.2d 451, 454 (1949); *Gulf, C. & S. F. Ry. Co. v. Settegast*, 79 Tex. 256, 15 S.W. 228, 230 (1891); *Jackson*, 194 S.W. at 846.

■ Finally, Premier argues the assignment was invalid because it was not in writing and, therefore, violated the statute of frauds. Section 5.021 of the Texas Property Code provides that a conveyance of an estate for more than one year, in land and tenements, must be in writing. Tex.Prop.Code Ann. § 5.021 (Vernon 1984). This provision has been held applicable to assignments of leases for terms longer than a year. *Duke v. Joseph*, 213 S.W.2d 535, 536 (Tex.Civ.App.—Austin 1948, writ ref'd).

■ In this case, we find that while there is no specific writing relevant only to the assignment, the Asset Purchase Agreement is sufficient to satisfy the statute of frauds. Section 1.5.1 of the Asset Purchase Agreement states that Premier is to acquire the liabilities accruing under the Lease after June 1, 1991. The statute of frauds was designed to prevent fraud and may not be employed to bring about the very thing it was designed to prevent. *Castrejana v. Davidson*, 549 S.W.2d 466, 468 (Tex.Civ. App.—Austin 1977, no writ). *See also Enochs v. Brown*, 872 S.W.2d 312, 318 (Tex. App.—Austin 1994, no writ); *Johnson v. Black*, 197 S.W.2d 523, 530 (Tex.Civ.App.—Eastland 1946, writ ref'd n.r.e.). To allow Premier to claim that the assignment was invalid based on the statute of frauds, after it took advantage of the terms of the assign-

---

applies to assignments as well as subleases and is made part of every lease contract by operation of law. *Gulf, C. & S. F. Ry. Co. v. Settegast*, 79 Tex. 256, 15 S.W. 228, 230 (1891) (holding that statute, though not specifically mentioning assignments, was applicable to assignments as well as subleases); *Lawther v. Super X Drugs of Texas, Inc.*, 671 S.W.2d 591, 592 (Tex.App.—Houston [1st Dist.] 1984, no writ) (same and holding that statute is part of lease by operation of law); *American Nat'l Bank & Trust Co. v. First Wisconsin Mortgage Trust*, 577 S.W.2d 312, 316 (Tex. Civ.App.—Beaumont 1979, writ ref'd n.r.e.) (citing *Young v. De La Garza*, 368 S.W.2d 667, 670 (Tex.Civ.App.—Dallas 1963, no writ)).

ment, would work the type of fraud the statute was designed to prevent.

Furthermore, several cases have held that an assignment existed, even without a formal writing acknowledging the assignment, when the assets of the business were sold by a tenant to a purchaser and the purchaser occupied the premises and paid rent. *See Johnson v. Golden Triangle Corp.*, 404 S.W.2d 44, (Tex.Civ.App.—Waco 1966, no writ); *Speed v. Jay*, 267 S.W. 1033, 1035 (Tex.Civ.App.—Amarillo 1924, no writ); *Jackson v. Knight*, 194 S.W. 844, 845–46 (Tex.Civ.App.—Amarillo 1917, writ ref'd). In *Johnson*, the court found that a "termination agreement," providing that a tenant would sell his business to a purchaser and the purchaser's subsequent occupation of the premises and payment of rent, constituted an assignment itself notwithstanding the fact that no formal assignment of the lease was contained in the agreement. 404 S.W.2d at 46. We find *Johnson* analogous, and hold that the assignment is not invalid under the statute of frauds. We overrule Premier's second cross-point.

In overruling Premier's two cross-points, we hold that the assignment between Dr. Burnett and Premier was valid. We will now address Twelve Oaks' points of error concerning termination of the lease and attorney's fees.

■ In its first nine points of error, Twelve Oaks challenges the judgment claiming it was entitled to recover rent for the full term of the lease. Twelve Oaks first argues, relevant to points of error one and two, that because the jury correctly found that Dr. Burnett assigned the lease to Premier, the jury's finding that the lease was terminated on December 1, 1992, based on Mrs. Burnett's letter, was incorrect as a matter of law.[3] Twelve Oaks claims that once Dr. Burnett assigned the lease to Premier, neither he nor his wife, acting as his executrix, could terminate it. Thus, the issue is whether an assignor retains the right to terminate a lease once he has assigned it to another. We find that he does not.

■ The word "assignment" has a comprehensive meaning and in its most general sense means the transfer or setting over of property or some right or interest from one person to another. *University of Texas Medical Branch at Galveston v. Allan*, 777 S.W.2d 450, 452 (Tex.App.—Houston [14th Dist.] 1989, no writ). It is a manifestation by the owner of a right or property of his intention to transfer such right or property to another. *See Pape Equip. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 399 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). It is the act by which one person transfers to another or causes to vest in another, his right or property or an interest therein, and unless it is qualified in some way, it is a transfer of one's *whole* interest. *Roach v. Schaefer*, 214 S.W.2d 128, 130 (Tex.Civ.App.—Fort Worth 1948, no writ) (emphasis added).

■ When dealing with transfers of leasehold estates, the definition of an assignment becomes more specific. When a lessee voluntarily transfers part or all of his interest under the lease to another, the transaction is either treated as an assignment or a sublease for the purpose of determining the rights and liabilities of all the parties involved. *Amco Trust, Inc. v. Naylor*, 159 Tex. 146, 317 S.W.2d 47, 50 (1958). When a lessee departs with his entire interest in all or part of the property in question, without retaining any reversionary interest, an assignment is created. *Id.* On the other hand, if the lessee retains any reversionary interest, no matter how small it may be, a sublease is created.[4] *Id.* In this case, Dr. Burnett transferred his entire interest in the Lease to Premier. Therefore, an assignment was created and the rules pertinent to as-

---

**3.** For the purposes of this opinion, we are assuming Mrs. Burnett's letter of December 1, 1992, was sufficient to give notice of termination pursuant to the death and disability clause in the Lease, assuming of course she even had the right to terminate.

**4.** If a sublease is created, there is no privity of estate between the lessor and the sublessee, and the latter is not liable to the lessor on any covenants in the lease unless he assumes or otherwise binds himself to perform them. *Amco Trust, Inc. v. Naylor*, 159 Tex. 146, 317 S.W.2d 47, 50 (1958).

signments, rather than subleases, are applicable.

 Liability to the original lessor for the payment of rent or the performance of other lease covenants may arise from either privity of contract or privity of estate. *Id.* An assignment of a lease destroys privity of estate between the lessor and the original lessee, but privity of contract between them remains. *Carter v. Stovall,* 291 S.W.2d 411, 413 (Tex.Civ.App.—Amarillo 1956, writ ref'd n.r.e.). The assignee becomes the tenant in place of the original lessee and is in privity of estate with the lessor. *Amco Trust,* 317 S.W.2d at 50. Accordingly, an assignee is liable for the rent and for the performance of the covenants that run with the land.[5] *Id.* Because an assignee is obligated to pay rent and perform those covenants that run with the land, he is likewise entitled to the benefit of all the covenants and agreements of the lessor which are annexed to and run with the land. *Cauble v. Hanson,* 224 S.W. 922, 924–25 (Tex.Civ.App.—El Paso 1920), *aff'd,* 249 S.W. 175 (Tex.Comm'n App.1923, judgm't adopted); *Fabrique, Inc. v. Corman,* 796 S.W.2d 790, 793 (Tex.App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 801 (Tex.1991); *Moore v. Kirgan,* 250 S.W.2d 759, 764 (Tex.Civ.App.—El Paso 1952, no writ). The benefits of the covenants in the lease should be conferred on the assignee because an assignor, after the assignment, generally loses all control and can do nothing to defeat the rights of the assignee. *Allan,* 777 S.W.2d at 453. This is because an assignment carries with it all rights, remedies, and benefits that are incidental to the thing assigned, and the effect of an assignment can only be limited by exceptions, reservations, conditions, or restrictions contained therein. *General Fin. Servs. v. Practice Place, Inc.,* 897 S.W.2d 516, 522 (Tex.App.—Fort Worth 1995, no writ).

The assignment in this case was an assignment of all the rights and benefits incidental to the lease. This is apparent from the language contained in the Asset Purchase Agreement and the fact that Premier bought all the assets of the business, occupied the premises, and paid rent,. There was no exception, condition, or restriction in the Asset Purchase Agreement or any other document that suggested the assignment was limited. Thus, as with all the other rights and benefits in the lease, any right to terminate the lease was transferred to Premier.[6] Premier's president and CEO, Thomas Usilton, admitted, in response to request for admissions, that it would have violated "the spirit of the asset purchase agreement" if Mrs. Burnett had attempted to terminate the lease immediately after Dr. Burnett's death without the consent of Premier.

 Additionally, any termination right that existed in the lease after the assignment belonged to Premier because, as we stated above, an assignee is entitled to the benefit of all the covenants and agreements in the lease that are annexed to and run with the land. *See Cauble,* 224 S.W. at 924–25; *Corman,* 796 S.W.2d at 793; *Moore,* 250 S.W.2d at 764. *See also Castle v. Double Time, Inc.,* 737 P.2d 900, 902 (Okla.1986) (holding that assignee who is in privity of estate with original lessor may avail himself of any covenants in original lease which "touch and concern" the land). A covenant runs with the land if it "touches and concerns" the land. *Inwood North Homeowners' Ass'n v. Harris,* 736 S.W.2d 632, 635 (Tex.1987). A promise by a landlord touches and concerns his interest in the leased property if it affects the use of the leased property by the tenant and is not related to other property. RESTATEMENT (SECOND) OF PROP-

---

**5.** Because the original lessee remains in privity of contract with the lessor, he is still liable for payment of rent, and the lessor has recourse against the assignee *or* the lessee for collection. *Carter v. Stovall,* 291 S.W.2d 411, 413 (Tex.Civ. App.—Amarillo 1956, writ ref'd n.r.e.) (emphasis added). If the lessor collects from the lessee, the lessee is entitled to recover those rents from the assignee. *Gray v. Tate,* 251 S.W. 820, 822 (Tex. Civ.App.—El Paso, 1923, no writ)

**6.** Whether Premier could use the death and disability termination clause after the assignment in the event of its own "demise" to terminate the Lease is a question that is not before this court. *Mrs. Burnett* is the one who attempted to use the clause based on Dr. Burnett's death, and the jury found that termination was effected by Mrs. Burnett's letter of December 1, 1992, not by anything Premier had done.

ERTY § 16.1 cmt. b (1977). If a promise does not meet the touch and concern test, it is personal and its survival after transfer depends on the intent of the parties. *Id.* Here, Twelve Oaks leased the property to Dr. Burnett and promised that upon his death or disability his estate had a right to terminate the Lease.[7] This promise affects Dr. Burnett's use of the property and is not related to other property. Therefore, the right to terminate was not personal to Dr. Burnett, rather, it touches and concerns the land and transferred to Premier upon assignment. Furthermore, a right that is personal to an assignor is one which, although related to the assigned property, constitutes an accrued cause of action that may be asserted independently of ownership of the property. *Jackson v. Thweatt*, 883 S.W.2d 171, 176 (Tex. 1994) (citing 6A C.J.S. *Assignments* § 76 (1975)). The right to terminate pursuant to the death and disability clause does not constitute a cause of action that can be asserted independently of the lease. Thus, we find the right to terminate a lease is not personal, that it touches and concerns the land and therefore, is annexed to and runs with the land.

■ Premier also argues that because of the language in the lease, including the definition of "Tenant" and its use in the death and disability clause, the right to terminate pursuant to that clause did not transfer, was personal to Dr. Burnett, and could only be acted upon by his executrix. We disagree.

In *Jackson v. Thweatt*, the supreme court had to determine whether purchasers of delinquent notes from FDIC were entitled to the benefit of the federal limitations period in 12 U.S.C. § 1821(d)(14) under which the FDIC has six years to bring suit on delinquent notes acquired from a failed bank.[8] 883 S.W.2d at 172. In 1984, Jackson executed a promissory note to a bank in Lampasas. *Id.* The FDIC became the owner of the note in 1985 when it was appointed receiver for the bank. *Id.* On December 28, 1988, the FDIC sold the note to Thweatt. *Id.* Thweatt sued Jackson on the note on April 15, 1991. *Id.* Jackson moved for summary judgment based on the four year statute of limitations set forth in section 16.004 of the Texas Civil Practice and Remedies Code. *Id.* The trial court granted the motion. The court of appeals reversed, holding that because Thweatt had acquired the note from the FDIC, the suit was governed by the six year limitations period in 12 U.S.C. § 1821(d)(14), and thus, Thweatt's suit was timely. *Id.* at 172–73.

On appeal to the supreme court, Jackson did not dispute that the suit would be governed by section 1821(d)(14) if the action had been brought by the FDIC; however, he claimed that because the suit was brought by a successor in interest to the FDIC, the section was inapplicable. *Id.* at 173. In the court of appeals decision, the court noted that section 1821(d)(14) expressly refers to actions brought by the FDIC, and therefore the court of appeals concluded that because of this plain language, the section could not

---

7. The death and disability provision states, in part:
 In the event of the death or total disability of Tenant from the practice of the diagnosing and treatment of allergies, as determined by a letter from a practicing doctor of the Harris County Medical Society, at any time during the term of the Lease, the executor or administrator of the estate of Tenant may, at their option, declare this Lease null and void by giving thirty (30) days notice of same, and at the thirtieth day from said notice, the obligation to pay rent shall cease.

8. Section 1821(d)(14) provides:
 (A) In General
 Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—
 (I) the 6–year period beginning on the date the claim accrues; or
 (II) the period applicable under State law. . . .
(B) Determination of the date on which a claim accrues
For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—
(i) the date of appointment of the Corporation as conservator or receiver; or
(ii) the date on which the cause of action accrues.
12 U.S.C. § 1821(d)(14).

be relied on by assignees of the FDIC. *Id.* at 174. Jackson argued to the supreme court that the limitations period under section 1821(d)(14) is personal to the FDIC because it is the only party expressly named in the statute. *Id.* at 176. Relying on the general law of assignments, the supreme court rejected this argument and held the limitations period was not a right "personal" to the FDIC because no cause of action could be raised independently of ownership of the notes. *Id.* Thus, the fact that only the FDIC was specifically named in the statute did not mean that an assignee could not take advantage of its benefit. The supreme court concluded that section 1821(d)(14) was applicable to Thweatt's suit. *Id.*

We find the complaint raised by Jackson analogous to the one raised by Premier in this case. Essentially, Premier claims that because the Lease defines "Tenant" as Dr. Burnett, and the death and disability termination provision refers to the "Tenant" and his executor, the right to terminate was not transferred by the assignment. Based on the analysis in *Jackson,* we reject Premier's argument. The right to terminate under the death and disability clause is not personal to Dr. Burnett because it is not a right that may be asserted independently of an interest in the property. *See id.* Under the assignment, Dr. Burnett transferred his entire interest in the property to Premier, and thus, the right to terminate transferred with the interest.[9]

■■■ Premier next contends that because privity of contract still existed between Dr. Burnett and Twelve Oaks after the assignment, Mrs. Burnett, as the executrix of the estate, was entitled to exercise the termination option. While none of the caselaw that we have reviewed concerning assignments specifically discusses the issue of privi-

ty of contract and its impact on the right to exercise termination clauses, we note that in every case, when the issue of the existence of privity of contract is discussed, it is only with regard to the original lessee's obligation to continue to pay rent. We find nothing to suggest that a lessee, after an assignment, is entitled to the *benefit* of any covenant in the lease. *See, e.g., Carter,* 291 S.W.2d at 413. Rather, the lessee has only a continuing obligation to pay rent, based on privity of contract, and can escape that obligation only if specifically released. *Id.* In fact, the case law recognizes that, after an assignment, the assignor's liability is in the nature of suretyship. *Gray v. Tate,* 251 S.W. 820, 822 (Tex. Civ.App.—El Paso 1923, no writ). His function is that of surety or guarantor for the assignee as to the rent obligation. *Id.*

Based on the above discussion, we sustain Twelve Oaks' first two points of error and hold that after the assignment, neither Dr. Burnett nor his wife could terminate the Lease. The jury's finding that the Lease was terminated on December 1, 1992 was obviously based on Mrs. Burnett's letter, and there is no finding to support early termination by Premier. Therefore, Premier is liable to Twelve Oaks for the rent for the entire Lease period. The undisputed evidence shows that the total amount of rent due, after a credit for the security deposit is applied, is $65,504.21.

Based on our findings on the cross-points and points of error one and two, we find it unnecessary to address points of error three through nine.

■■■ The only remaining issues in the case concern Twelve Oaks' complaints about the attorney's fees awarded by the trial court. In point of error ten, Twelve Oaks claims the trial court's refusal to submit the

---

9. Though we have found no Texas cases specifically addressing whether a termination clause transfers to the assignee, in *Martin v. Stires,* 171 S.W. 836, 837 (Tex.Civ.App.—San Antonio 1914, no writ), the court noted that an assignee had the right to terminate the lease. In that case, Martin sued Stires to recover rent in the amount of $175. Martin had rented a piece of land adjoining the building he was occupying to the Schuler Company for advertising purposes. *Id.* The Schuler Company sold their business to Stires

and transferred its "entire interest in the lease of the premises." *Id.* at 838. While it was not an issue in the case, the court, on motion for rehearing, stated that Stires, as assignee of the Schuler Company, had the right to terminate the lease at the end of any quarter as provided by the lease. *Id.* This case provides support, though admittedly indirectly, for the proposition that the right to terminate a lease belongs to the assignee after an assignment.

proposed jury question on contingent attorney's fees is reversible error. We disagree.

First, if the trial court omits a question relied on by the complaining party, a request for the submission of the omitted matter is the only means of preserving the issue for appellate review. Tex.R.Civ.P. 274, 278, 279. Requests must be tendered in writing and in substantially correct wording.[10] Tex.R.Civ.P. 278. They must be tendered separate and apart from objections to the charge. Tex.R.Civ.P. 273.

Twelve Oaks does not cite us to the place in the record where its written request, if any, is located. Moreover, we have searched the record and have found no written request by Twelve Oaks for a question on contingent attorney's fees. An appellate court must hear and determine a case on the record as filed. *Mitchison v. Houston Indep. Sch. Distr.*, 803 S.W.2d 769, 771 (Tex.App.—Houston [14th Dist.] 1991, writ denied). The fact that Twelve Oaks set out the question it allegedly requested in its brief is insufficient. *See id.* Therefore, Twelve Oaks has waived any complaint on this issue.

■ Second, even if Twelve Oaks had not waived review, its point of error would still fail. In question four of the jury charge, the jury was asked to determine the amount of reasonable fees due Twelve Oaks' attorneys for pre-trial preparation, appeal to the court of appeals, making or responding to an application for writ of error to the supreme court, and granting of an application for writ of error to the supreme court. Twelve Oaks contends that in addition to this question, it was also entitled to a question as to attorney's fees based on a contingency arrangement. In support of this contention, Twelve Oaks cites three cases; however, none of them supports the contention that a party is entitled to two submissions on attorneys fees. *See Allen v. Allen*, 751 S.W.2d 567, (Tex. App.—Houston [14th Dist.] 1988, writ denied); *March v. Thiery*, 729 S.W.2d 889 (Tex. App.—Corpus Christi 1987, no writ); *Termi-*

*nix Int'l v. Lucci*, 670 S.W.2d 657 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). In each of these cases either one or the other submission was given. In other words, a party may be entitled to one or the other, but he is not entitled to both.

■ Further, in determining whether an alleged error in the jury charge is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and *the charge in its entirety. Island Recreational Dev. Corp. v. Republic of Texas Savings Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). Alleged error will be deemed reversible only if, when viewed in light of the totality of the circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Id. See also* Tex.R.App.P. 81(b)(1). Because Twelve Oaks received a jury question on attorney's fees, a question that was answered in their favor, it was not reversible error to refuse to submit a question on contingent attorney's fees. We do not agree that merely because the jury heard evidence of a contingency fee agreement between Twelve Oaks and its attorneys, the jury was unsure how to answer the "time and charges" question that was actually submitted. Furthermore, Twelve Oaks is the one who introduced the evidence on the number of hours spent working on the case and the reasonable fee per hour. Premier objected to this testimony, not once, but twice, on the ground it was irrelevant given the existence of a contingency fee agreement between Twelve Oaks and its attorneys. These objections were overruled by the trial court and Twelve Oaks continued with the evidence. Point of error ten is overruled.

■ In point of error twelve, Twelve Oaks claims the trial court erred in *sua sponte* reducing the jury's award of attorney's fees from $12,637.50 to $3,033.39 and eliminating all attorney's fees for appeals. Contrary to Twelve Oaks' assertion, the trial

---

10. There is one exception to the rule that a request is required to complain of an omitted question. Rule 278 provides that a failure to submit a question is not fatal to appellate review if the question is one relied upon by the opposing party. Tex.R.Civ.P. 278. In this case, the attorney's fee question was one relied on by the complaining party, and thus, the exception does not apply.

court's reduction was not *sua sponte;* rather, it was based on Premier's Motion for Judgment. In that motion, Premier claimed Twelve Oaks was not entitled to the fees awarded by the jury because the Lease limited the amount of attorney's fees recoverable. We agree.

■ Attorney's fees are not recoverable unless provided for by statute or by contract between the parties. *New Amsterdam Casualty Co. v. Texas Indus., Inc.,* 414 S.W.2d 914, 915 (Tex.1967). In this case, the Lease, the contract between the parties, provides that in the event of litigation relating to the Lease, the prevailing party shall be entitled to recover from the losing party "any costs or reasonable attorney's fees *incurred* by the prevailing party in connection with such litigation." (emphasis added) Thus, Twelve Oaks agreed to limit its recovery to attorney's fees it had actually incurred as a result of any litigation associated with the Lease. Parties have a right to contract as they see fit as long as the contract does not contravene public policy and their contracts are not illegal. *See Benbow v. Boney,* 240 S.W.2d 438, 441 (Tex.Civ.App.—Waco 1951, writ ref'd).

The record shows that the costs and attorney's fees Twelve Oaks would *incur* were set by the fee agreement with its attorneys. In that agreement, Twelve Oaks was required to pay its attorneys $2,500 plus 40% of any recovery in excess of $17,000. Thus, based on the Lease terms and the fee contract, the court correctly reduced the jury's award to $3,033.39, i.e., $2,500 plus 40% of $1,333.47 (damages awarded less $17,000).

We find the case cited by Twelve Oaks, *Rauscher Pierce Refsnes, Inc. v. Koenig,* 794 S.W.2d 514 (Tex.App.—Corpus Christi 1990, writ denied), inapplicable here. In *Koenig,* the court held the fact that a contingency fee agreement existed did not in and of itself determine the amount of attorney's fees that could be recovered. 794 S.W.2d at 516. The court held that when the recovery of attorney's fees is provided for by statute, the amount of the fees must be found by the trier of fact and supported by the evidence. *Id.* In this case, unlike *Koenig,* the attorney's fees were not based on statute. Rather, there was an underlying contract between the litigants that limited recoverable attorney's fees to those actually incurred.

We hold the trial court did not err in reducing the amount of attorney's fees to reflect an amount agreed to in the Lease. However, because we have found the judgment incorrect and ordered the damages awarded to Twelve Oaks increased, we remand the attorney's fees issue for determination of the amount in accordance with this court's opinion. Point of error twelve is overruled.

Because of our decision in point of error ten, we find it unnecessary to address Twelve Oaks' sufficiency point as to the award of attorney's fees by the jury.

In conclusion, we reverse the trial court's judgment and remand the case for entry of: (1) a new judgment awarding damages in accordance with this opinion; (2) calculation and entry of attorney's fees based on the new damage award; and (3) calculation and entry of prejudgment and postjudgment interest based on the new damage award.

EDELMAN and O'NEILL, JJ., concur in the result only.