COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| NOTTINGHAM MANOR OWNERS ASSOCIATION, VIRGINIA WHITE, and OTHER OWNERS OF RESIDENTIAL PROPERTY IN THE NOTTINGHAM MANOR TOWNHOMES, | § § § § | No. 08-06-00312-CV Appeal from the County Court at Law No. 5 |
| Appellants, | § | of El Paso County, Texas |
| v. | § | (TC#2003-3234) |
| | § | |
| EL PASO ELECTRIC COMPANY, | § | |
| Appellee. | § | |
| | § | |

## O P I N I O N

Appellants, Nottingham Manor Owners Association (the "Association"), Virginia White, and Other Owners of Residential Property in the Nottingham Manor Townhomes, appeal the trial court's denial of its motion for judgment notwithstanding the verdict. Appellants also challenge the factual sufficiency of the jury's verdict. We affirm the judgment of the trial court.

## I. BACKGROUND

In the late 1970's, Sierra Properties, Inc. ("Sierra") began constructing condominia known as Nottingham Manor Townhomes (the "Townhomes"). The site for the Townhomes was a piece of property along Stanton Street, a public street in El Paso. Sierra owned a parcel of property on both the west and east sides of Stanton Street, which runs roughly north-south through Sierra's property. Appellee, El Paso Electric Company ("EPEC"), was and is the owner of a 150-foot wide swath of land that runs roughly east-west through a portion of Sierra's property, on both sides of Stanton Street.

On June 9, 1978, Sierra and EPEC entered into a lease agreement, effective January 1, 1979, whereby Sierra leased the EPEC land running across its property on either side of Stanton. The lease described the leasehold property as "[a] portion of F.W. Brown Survey 224 as shown on attached print as Exhibit 'A' and made a part hereof . . . ." Exhibit A contained a survey depicting the leasehold property as a shaded area on both sides of Stanton Street. The shaded area is labeled "Subject Property" on both the east and west sides of the street. The parties agreed to a ten-year lease term and annual rental payments of $1,200. Sierra was prohibited from assigning the lease without EPEC's prior written consent, with the exception that Sierra had the right to mortgage and assign the lease to a lender providing a construction loan. In October 1980 Sierra and EPEC amended the lease term to extend to 2033. The amendment contained a copy of the exhibit used in the original lease. The lease and the amendment were filed in the real property records of El Paso County.

Although no condominia were built on the leased property, the main entrance to the Townhomes and portions of the parking lot were built on it. For many residents, this entrance provides the sole means of automobile access to their condominium units. The swimming pool was built within inches of the boundary of the leased property.[1] Although EPEC acknowledges that all of the pool itself is within Sierra's property, a substantial portion of the pool deck sits on the leased area.

On or about March 10, 1982, Sierra filed a Declaration of Covenants Conditions and Restrictions of Nottingham Manor Townhomes (the "Declaration"). The Declaration contained the following recitals:

---

[1] Each of the townhomes is north of the leased area, while the swimming pool is south of that area.

2

WHEREAS, Declarant is the owner of the real property situated in the City and County of El Paso, State of Texas, which is described as follows:

Fee Title

A parcel of land out of Lots 5, 6 and 7, CAMELOT HEIGHTS, an addition in the City of El Paso, El Paso County, Texas, according to the map thereof on file in Book 26, Page 25 of the Plat Records, El Paso County, Texas, more particularly described by metes and bounds on Exhibit "A" attached hereto.

Leasehold Estate

A parcel of land leased from El Paso Electric Company out of the F.W. Brown Survey, No. 224, more particularly described by metes and bounds on Exhibit "A" attached hereto.

Such real property being hereinafter referred to as the "Property;" and

WHEREAS, in Phase I Declarant proposes to construct seven (7) buildings on the Property containing fifty (50) separately designated units; and

WHEREAS, Declarant desires to subject the said Property and the improvements to be constructed thereon to a condominium regime pursuant to the terms and provisions of the Texas Condominium Act, Art. 1301(a), Vernon's Annotated Texas Statutes, as amended.

The Declaration provided that "Declarant does hereby divide the Project into fifty (50) Condominium Units, each consisting of a separate fee simple estate in a particular Unit, and an appurtenant undivided fee simple interest in the Common Elements. The undivided interest in the Common Elements appurtenant to a particular Unit is as set forth on Exhibit 'C . . . .'" The percentage of common area ownership of each of the fifty proposed units as listed in Exhibit "C" varied from unit to unit. The Declaration provided that rentals payable to El Paso Electric Company pursuant to the terms of the lease were included in the regime's common expenses.

Phase I of the Project was to be constructed on the east side of Stanton Street. The Declaration provided that Phase II would contain an additional 45 units and Phase III, an additional

3

21 units. Sierra planned to build Phases II and III on the west side of Stanton Street. The plan to build fifty condominia for Phase I was eventually abandoned, and Sierra actually built only nineteen units, plus the swimming pool, all located on the east side of Stanton Street. Sierra also abandoned its plans to build any portion of Phases II and/or III.

In February 1988, Sierra obtained a $4.5 million loan from Rainier National Bank in Seattle. To secure the loan, Sierra entered into an agreement entitled "Deed of Trust, Security Agreement, Financing Statement, and Assignment of Rental" (the "Deed of Trust Agreement"), that covered various Sierra properties, including Sierra's property on the west side of Stanton Street, across from the Townhomes. The document described the EPEC leasehold on the west side of Stanton Street and referenced an attached metes and bounds description that described the portion of the lease on that side of the street only. The agreement was modified in June 1988, in order to "better and more fully describe the Land and the Leased Land." The modified instrument contained some minor differences in certain tracts described in the original instrument, but it contained the same description of the lease as that in the Deed of Trust Agreement.

In 1990, Sierra defaulted on the loan, and the bank foreclosed on the property. The properties were purchased at the foreclosure sale by the Rainier National Bank's successor, Security Pacific Bank. On June 29, 1993, Security Pacific's successor-in-interest, Seattle-First National Bank, sold the property on the west side of Stanton Street to Odom Investments, Inc. The property purchased by Odom did not (and did not purport to) include the Townhomes or the EPEC lease on the east side of Stanton Street.

Before it conveyed the property to Odom, Seattle-First, along with Sierra and EPEC, entered into an Agreement for Termination of Lease and Mutual Release (the "Termination Agreement").

4

The Termination Agreement provided:

> El Paso Electric Company as lessor ("Lessor") and Sierra Properties, Inc. as lessee ("Sierra") entered into a Lease Agreement dated June 9, 1978 effective January 1, 1979, recorded in Volume 1176, Page 1331, of the Real Property Records of El Paso County, Texas, as amended by a Lease Amendment dated October 24, 1980, recorded in Volume 1176, Page 1340, of the Real Property Records of El Paso County, Texas (collectively, the "Lease"), pertaining to certain real property described in the Lease and shown as the two shaded areas labeled, "Subject Property" on the attached Exhibit A.

(Emphases in original).

Exhibit A to the Termination Agreement contained the same depiction of the lease as was contained in the original lease and modification, in which the leased property was shaded on both sides of Stanton Street, and the term "Subject Property" was written in both shaded areas. The Termination Agreement also described the Deed of Trust Agreement and Sierra's default, along with the foreclosure and subsequent sale of the property to Seattle-First.

Exhibit B to the Termination Agreement contained a metes and bounds description of the leased property, which described only the property on the west side of Stanton. This was the same metes and bounds description that was attached to the Deed of Trust Agreement. The Termination Agreement further provided that "[l]essor, Sierra and Seattle-First wish to terminate the Lease and release each other from any further liability or obligation one to the other with regard to the Lease or the leased premises." In conjunction with the Termination Agreement, Odom and EPEC entered into a lease of the EPEC property located on the west side of Stanton.

Invoices sent by EPEC for the annual lease payment were apparently addressed to Sierra until 1991 and then were subsequently addressed to "Home Owners Association c/o Nottingham Manor." An invoice dated February 16, 1993, was mailed to the Association. The Association paid the annual

5

$1,200 rental payment for 1993. EPEC did not mail any other invoices for payment of the lease, and the Association did not make any subsequent rental payments. Sierra went out of business in the early 1990's, at which time it was apparently liquidated in conjunction with a bankruptcy proceeding.[2]

During a review of its leased properties in 2002, EPEC discovered that the previously leased tract of land on the east side of Stanton, abutting the Townhomes, was not leased. It was the policy of EPEC to lease its land, if possible, for liability reasons and as income. EPEC contacted the Association's property manager, Paul D. Hiett, concerning a lease. In a letter dated May 9, 2002, Hiett responded that:

> The Nottingham Manor Board of Directors doesn't have the power or the authority to execute the LEASE AGREEMENT you sent to my office for the El Paso Electric easement that runs through the Association's parking lot. The original developer, William Farah of Sierra Camelot and Sierra Invesco never did complete the development and therefore never turned the property over to the Board of Directors. There are still 31 lots of the original 50-unit condominium regime still left to be developed by Sierra Invesco and Sierra Camelot.
>
> According to the Nottingham Manor Declarations and Restrictive Covenants the developer must build and sell at least fifty percent of the lots in the development prior to turning over the management to the Board of Directors. This has not been accomplished and the Board of Directors can't legally execute any document on behalf of the Nottingham Manor Townhomes Association, Inc.

Despite Hiett's assertions, the Association and EPEC subsequently engaged in negotiations for a new lease. On December 12, 2002, counsel for the Association sent a check in the amount of $1,000 for lease of the EPEC property and explained in an accompanying letter that he would forward a signed copy of the lease to EPEC. EPEC never received the signed lease and never cashed

---

[2] The sole evidence concerning Sierra's liquidation was presented in the deposition testimony of Kenneth Farah, who testified that Sierra was liquidated in "the early '90's. I think '92, '93, somewhere in there."

the check. On July 14, 2003, counsel for EPEC sent correspondence to the Association advising that its tenancy at sufferance was terminated and demanding that it vacate the premises within three days.[3]

On August 4, 2003, the Association filed this lawsuit. It sought a declaration that the lease was still in effect, or, alternatively, that it had an easement by estoppel or a prescriptive easement. The Association also sought temporary and permanent injunctions that would prohibit EPEC from fencing the property or denying access to the property. EPEC asserted counterclaims seeking a declaration that it owned the property and an action to quiet title, through which EPEC sought the value of rent on the property since 1993.

The case was tried before a jury on April 18, 2006. The Appellants stipulated at trial that they were withdrawing their claims for prescriptive easement and for adverse possession. In a unanimous verdict, the jury found that the Termination Agreement included the Association property on the east side of Stanton and that EPEC was not estopped from claiming that the 1978 lease was terminated as to the Association property. The jury awarded EPEC damages for the rental value of its property from 1995 through 2006.

On appeal, Appellants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict and that the evidence was factually insufficient to support the jury's finding that the Termination Agreement applied to the Nottingham property.

## II. DISCUSSION

### A. Standards of Review

---

[3] Insofar as the record reflects, none of the Association members has actually vacated the premises and EPEC has taken no legal action to enforce its demand.

We review denial of a JNOV under a legal sufficiency standard. *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 191 (Tex. App.--El Paso 2005, pet. denied). A party challenging the legal sufficiency of an adverse finding on an issue on which that party had the burden of proof at trial must demonstrate that the evidence conclusively established all vital facts in support of the issue, as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex. App.--El Paso 2006, no pet.). In order to overcome an adverse fact finding as a matter of law, the challenging party must surmount two hurdles. *State Dep't of Transp. v. Barraza*, 157 S.W.3d 922, 926 (Tex. App.--El Paso 2005, no pet.). First, the record must be examined for evidence that supports the finding, crediting favorable evidence, if a reasonable jury could, and disregarding contrary evidence, unless a reasonable jury could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). If there is more than a scintilla of evidence to support the jury's finding, the motion for JNOV was properly denied. *Richard Rosen*, 225 S.W.3d at 191-92. The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding, given the facts proved in the particular case. *Id.* at 192. Second, if there is no evidence to support the finding, then the entire record must be examined to determine whether the contrary proposition is conclusively established as a matter of law. *Barraza,* 157 S.W.3d at 926.

Where, as here, the party with the burden of proof is challenging the factual sufficiency of the findings, the appropriate complaint is that the adverse findings are "against the great weight and preponderance of the evidence." *Tate v. Tate*, 55 S.W.3d 1, 5 (Tex. App.--El Paso 2000, no pet.). In reviewing a factual sufficiency point, we must consider all of the evidence and determine whether the adverse finding was so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We do not pass upon

8

the witnesses' credibility, nor do we substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 82 (Tex. App.--El Paso 2007, pet. denied).

### B. Denial of Appellants' JNOV

Appellants make several arguments in an effort to show that the evidence was legally insufficient to support the jury's findings. The Association contends that it was the owner of the lease by virtue of the Declaration and Sierra's sales of the condominia; that it became a party to the lease because EPEC accepted it as a tenant; and that the language of the Termination Agreement and the context of related transactions show that the Termination Agreement did not apply to the east side of Stanton Street, where the condominia are located.

### 1. Ownership of the Lease

Appellants argue that Sierra conveyed its leasehold interest as part of the Declaration that established the Association's condominium regime. Appellants contend that, by operation of "condominium law" and the Declaration, when Sierra sold the condominium units to the individual buyers, it no longer had any ownership or management interest in the project or any interest in the lease. As a result, the lease was transferred to the Association, and it formed part of the common elements conveyed to the buyer of each unit.

EPEC responds that the Declaration did not meet the statutory requirements for the creation of a condominium regime. Consequently, the Association did not obtain the lease. EPEC also contends that Hiett's letter of May 9, 2002, constitutes an admission that Sierra did not complete the project or turn the property over to the Association.

Chapter 81 of the Texas Property Code applies to condominium regimes created before

9

January 1, 1994. TEX. PROP. CODE ANN. § 81.0011. Section 81.102 provides that:

> (a) A declaration, master deed, or master lease for a condominium must contain:
>
> (1) the legal description of the real property dedicated to the condominium regime, depicted by a plat of the property that locates and identifies by letter each existing or proposed building;
>
> (2) a general description of each apartment, including the square footage, location, number, and other information necessary for identification of the apartment, depicted by a plat of the floor of the building in which the apartment is located that identifies the building by letter and the floor and the apartment by number;
>
> (3) a general description of each area not already described that is subject to individual ownership and exclusive control, such as a garage or carport, depicted by a plat that shows the area and appropriately identifies it by letter or number;
>
> (4) a description of the general common elements that are not described under Subdivision 1;
>
> (5) a description of the limited common elements;
>
> (6) each apartment's fractional or percentage interest in the entire condominium regime;
>
> (7) a provision that the declaration may only be amended at a meeting of the apartment owners at which the amendment is approved by the holders of at least 67 percent of the ownership interests in the condominium; and
>
> (8) a provision that an amendment of the declaration may not alter or destroy a unit or a limited common element without the consent of the owners affected and the owners' first lien mortgagees.

TEX. PROP. CODE ANN. § 81.102(a).

EPEC argues that the Declaration does not meet the requirements of subsections (1), (2), (6), and (7). With respect to subsection (1), the Declaration contains a metes and bounds description of the Phase I property. However, due to the poor quality of the exhibit, it is not possible to determine

10

whether lettering of the buildings is present. The Declaration does not contain information meeting the requirements of subsection (2). With regard to subsection (6), although the Declaration contains an exhibit for each apartment's fractional or percentage interest in the entire condominium regime, the fractional interests are based on the existence of fifty units, and not nineteen units. As for subsection (7), the Declaration contains a provision that permits amendment of any provision contained in the Declaration by the recording of a written instrument that specifies the amendment and that is executed "by the Owners of Condominium Units representing an aggregate ownership interest of seventy-five percent (75%) or more of the Common Elements and first Mortgagees whose liens encumber an aggregate ownership interest of seventy-five percent (75%) or more of the Common Elements . . . ."

EPEC's most significant argument in this regard is that, because only nineteen of the fifty units contemplated by the Declaration were built, the condominium regime was never formed. The implication is that full ownership of the common elements, including the lease, was never conveyed to the Association. The Association argues that, once the condominium units were sold, Sierra no longer had any ownership or management interest in the project or any interests under the lease, so that the lease was "effectively" transferred to the Association.

Appellants rely on *Preston Del Norte Villas Ass'n v. Pepper Mill Apartments, Ltd.*, 579 S.W.2d 267 (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.), for this proposition. In *Preston Del Norte*, the developer owned twenty-one acres of land, of which six acres were made subject to a condominium declaration. *Id.* at 268. The declaration provided that, for a limited time, the developer could amend the declaration to include the remaining fifteen acres as part of the condominium project. The declaration also reserved to the developer the right to establish easements

11

and provided that the developer and its successors and assigns had a permanent easement across the six acres for ingress and egress to the remaining land. The developer continued with the development of the condominium project on the six-acre tract, and the remaining land was subsequently sold to the appellee, Pepper Mill Apartments, Ltd. *Id.* at 268-69. Pepper Mill permitted contractors to operate construction equipment across the roadways of the condominia, which prompted the appellants to erect a barrier preventing access to the apartments. Pepper Mill sought and obtained an injunction prohibiting this. Among the arguments that the appellants made on appeal was that the trial court erred in concluding that Pepper Mill's easement rights inured to the benefit of its tenants or lessees. The Dallas Court of Appeals disagreed and noted that the declaration expressly reserved an easement for the developer and its successors and assigns. *Id.* at 271. The court concluded that "[w]e see no reason why plaintiff, as the successor of Preston Centennial, could not assign its easement right of ingress and egress temporarily by lease as well as permanently by deed. Such rights would pass as appurtenant to any conveyance or lease of property within the fifteen-acre tract described in the declaration." *Id.*

In *Preston Del Norte*, a developer created an easement that it later conveyed to the owner of a property bordering the condominia. It does not address the present case, in which the condominium developer is not the owner of the property at issue, but rather has leased it from a third party and executed a termination of that lease. Moreover, there is nothing to indicate that the developer in *Preston Del Norte* did not complete the condominium project, as happened in the present case.

Appellants also rely on *Fairway Villas Venture v. Fairway Villas Condominium Ass'n*, 815 S.W.2d 912 (Tex. App.--Austin 1991, no writ). In *Fairway Villas*, the condominium plan called for

12

the development of nine buildings as part of the condominium regime. *Id.* at 913. The developer built five buildings and claimed ownership of the remaining four "building sites." *Id.* at 913-14. The builder claimed title, pursuant to a deed that referred to specific units in the four building sites. *Id.* at 914. The association assessed the developer for a pro rata share of general condominium expenses. *Id.* at 914. The developer sued for a declaratory judgment that he did not owe any dues, and the association counterclaimed, arguing that the developer was an "apartment owner" under the terms of the Condominium Act. *See* TEX. PROP. CODE ANN. § 81.204. The trial court denied the developer's claim and granted summary judgment in favor of the association on its counterclaim. The Austin Court of Appeals affirmed. *Id.* at 915. The court held that the term "apartment owner," as used in section 81.204, applied to the "building sites" claimed by the developer, because the only structures that could be owned exclusively in a condominium regime are apartments. All remaining areas are common elements. *Id.* at 914-15. As such, the court concluded that the pro rata share requirement of section 81.204 applies to the owners of apartments in both existing and proposed buildings. *Id.* at 915. Though the facts of *Fairway Villas* involve an unfinished condominium project, it does not address the issue of whether a condominium regime is invested with all of the ownership interest of a developer who completes only a portion of the project and does not convey its remaining interest in the property.

Pursuant to the Declaration in the present case, the fractional share of common elements of fifty units equaled 100 percent ownership of the common elements. Thus, under the terms of the Declaration, upon the conveyance by Sierra of each of the fifty units, 100 percent of the leasehold interest and fee simple interest in the property were to be transferred from Sierra. Exhibit C to the Declaration sets out the fractional percentage of common elements ownership that corresponded to

13

each of the fifty units. These percentages vary among the units, ranging from 1.6204 percent to 2.3293 percent. The undisputed evidence showed that Sierra only built nineteen of the fifty planned condominium units. As Paul Hiett, the property manager for the Association, testified, the condominium owners each "own a share, one percent or two percent or whatever it is, for each unit based on 50 units." Appellants did not present any evidence that the Declaration was amended with respect to the common ownership shares of the nineteen units. If anything, the Declaration and the subsequent sale of only nineteen units indicate that Sierra still owned a majority interest in the common areas of the property at the time it executed the Termination Agreement. Indeed, as the Association's property manager wrote in his May 9, 2002 correspondence, Sierra never finished the project and "never turned the property over to the Board of Directors." Hiett also testified on cross-examination that, to his knowledge, the Declaration did not describe the square footage of each apartment unit and that he did not know whether the Declaration provided that it could only be amended at a meeting of the apartment owners with the approval of at least 67 percent of the ownership interest.

Appellants presented the deposition testimony of Kenneth Farah, who testified that, by the time Sierra entered into the Deed of Trust Agreement in 1988, it had relinquished control of the Townhomes to the Association. Farah also testified that Sierra did not have any interest or legal standing in the property on the side of Stanton on which the Townhomes are located. However, Appellants did not introduce any deeds to show that the condominium owners owned the entire percentage of the common areas of the property. Generally, parole evidence is insufficient to prove title to real property, when title is directly at issue. *See Ramsey v. Jones Enters.*, 810 S.W.2d 902, 904 (Tex. App.--Beaumont 1991, writ denied) (testimony of title examiner could not be used to

14

prove up title in trespass to try title action); *see also In re Marriage of Murray*, 15 S.W.3d 202, 205 (Tex. App.--Texarkana 2000, no pet.) ("Under general property law principles, a deed is prima facie evidence of the grantee's ownership."); *cf. Fannin Bank v. Johnson*, 432 S.W.2d 138, 141 (Tex. Civ. App.--Houston [1st Dist.] 1968, writ dism'd) (if title to real property is collateral to the issue at hand, oral testimony may be permitted).

Considering the foregoing, the Association did not establish that, as a matter of law, it was the owner of the lease and that Sierra was without authority to terminate it. As such, the evidence was legally sufficient to support the jury's verdict, and the trial court did not err in denying Appellants' motion for judgment notwithstanding the verdict in this regard.

## 2. The Association as Tenant of the Lease

Appellants also contend that the trial court erred in denying their motion for judgment notwithstanding the verdict, because EPEC accepted the Association as a tenant under the lease. EPEC asserts that the Association was not the proper party for termination of the lease, because no privity existed between it and EPEC with regard to the lease. Notably, the lease provides:

> Lessee shall not assign this Lease without the prior written consent of Lessor, which consent shall not be unreasonably withheld. Lessee may sublease the premises, or any part thereof, provided that the original Lessee shall at all times remain fully responsible and liable for payment of the rent herein specified and for compliance with all of the other obligations upon Lessee under this Lease. . . . Notwithstanding the foregoing, Lessee shall have the right to mortgage its leasehold interest, and/or assign this Lease and all of its rights hereunder, to any mortgage company, bank, insurance company or lending agency making the loan for the construction of permanent improvements upon the property adjoining the leased premises . . . .

In general, if an instrument conveys the entire "term" of a lease, without retaining any reversionary interest, the instrument will be construed as an assignment. *718 Assocs., Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 360 (Tex. App.--Waco 1999, pet. denied) (citing *Davis v. Vidal*,

105 Tex. 444, 151 S.W. 290, 291 (1912)). The word "term" refers to more than just the length of time for which the lease is given. *Id.* The assigning instrument must convey both the entire time for which the lease runs and the entire estate or interest conveyed by the original lease. *Id.* "[I]f the conveying party retains any reversionary interest in the estate conveyed, the instrument will be construed as a sublease." *Id.*

It is undisputed that EPEC never gave written consent to any assignment by Sierra to the Association. Appellants did not present any evidence that Sierra ever assigned the lease. Nor was there any evidence that the Association ever sought assignment of the lease. As the Association's property manager testified, he was not aware of any document sent to EPEC requesting an assignment. EPEC's representative testified that it had no record of the Association's having requested consent to assign or transfer the lease. Instead, Appellants argue that EPEC waived any complaint that it did not grant written consent for the assignment of the lease and that the Association became EPEC's tenant by virtue of the latter's actions subsequent to the execution of the lease.

Estoppel is ordinarily a question of fact for the determination of the jury; however, it may be established as a matter of law by undisputed evidence as to material facts. *Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 752 (Tex. App.--Corpus Christi 2001), *pet. denied*, 92 S.W.3d 530 (Tex. 2002) (per curiam) (the Supreme Court's opinion addressed a different issue); *see also Reynolds v. McCullough*, 739 S.W.2d 424 (Tex. App.--San Antonio 1987, writ denied) (waiver is a question of fact for the trier of fact to determine and must be clearly proven). The jury was asked whether EPEC was estopped from claiming that the 1978 lease was terminated as to the Nottingham property. The jury returned a unanimous verdict that EPEC was not estopped.

16

Appellants point to a 1981 easement granted by "Nottingham Manor Townhomes" that gave EPEC access to install and maintain one pole, along with any other necessary enumerated equipment, as evidence that EPEC accepted the Association as a tenant. Appellants also point to three EPEC invoices – dated January 11, 1991, January 23, 1992, and February 16, 1993 – that were addressed to "Home Owners Association c/o Nottingham Manor."[4] Appellants further rely on *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 111-12 (Tex. App.--Houston [14th Dist.] 1996, no writ).

The facts in *Twelve Oaks* are markedly different from those in the present case. In that case, a doctor entered into a lease for office space in a medical office building. *Id*. at 106. The building was later foreclosed upon by the FDIC. Subsequently, the doctor entered into an asset purchase agreement, whereby the doctor sold substantially all of his assets to Premier. The agreement also provided that the doctor would assign the lease to Premier. Premier never actually took over the lease, but paid the rent, took possession of the office, and renamed it. The doctor died prior to FDIC's sale of the property to Twelve Oaks in July of 1992. After the sale, Premier made rental payments to Twelve Oaks, but informed Twelve Oaks at the end of August 1992 that it was terminating the lease. *Id*. at 107. In December, the doctor's estate informed Twelve Oaks that the lease terminated upon the doctor's death. Twelve Oaks brought suit against Premier and the doctor's estate. The jury found that the doctor and Premier agreed to an assignment of the lease and that the lease was terminated in December of 1992. On appeal, Premier argued that there was no assignment of the lease by the doctor as a matter of law, because no landlord ever consented to the assignment. *Id*. at 110. The Fourteenth Court of Appeals disagreed. The court held that Premier was estopped

---

[4] The other invoice contained in the record was for the year 1990 and was addressed to Sierra.

17

from claiming that the doctor never assigned the lease, because it availed itself of the benefits of the lease. *Id.* at 111. As for Premier's argument that the landlord never consented to the assignment, the court noted that the argument was not Premier's to make. The court explained:

> It is well established that a provision in a lease prohibiting assignment without the landlord's consent is a provision for the landlord's benefit and may be waived by the landlord. In other words, a tenant's failure to obtain the required consent does not render the assignment void, rather, it is voidable at the option of the lessor. The lease does not terminate unless the landlord undertakes to terminate it or declare a forfeiture or reenter.

*Id.* at 112 (citations omitted). The court noted that "[a] lessor waives its right to forfeit a lease for a tenant's failure to obtain consent before assigning or subleasing if it accepts rents after the assignment or sublease." *Id.* Because Twelve Oaks did not complain of the assignment, the lease was valid. In contrast to the facts in *Twelve Oaks*, there was no evidence that Sierra ever assigned or agreed to assign the lease to the Association.

At trial, EPEC's representative, Loy Wells, explained that it was not out of the ordinary for EPEC to bill entities that were not named on a lease and that "[w]e have name changes all of the time." Wells also testified that EPEC considered Sierra the owner of the lease. The Termination Agreement itself was evidence that both Sierra and EPEC were the sole parties to the lease. EPEC did not seek payment from the Association following the Termination Agreement, and the Association did not make any payments. Moreover, the Association sought to negotiate a new lease in 2002, after EPEC discovered that the land on the condominium property was not leased and informed the Association of this discovery. Considering the foregoing, the evidence was legally sufficient to support the jury's verdict that EPEC was not estopped from claiming that the 1978 lease was terminated.

18

### 3. The Metes and Bounds Description

Nottingham also argues that the Termination Agreement applied only to the west side of Stanton Street, because the Termination Agreement contained a metes and bounds description that specifically limited the termination to the west side. The Termination Agreement provides the following definition of the lease subject to termination:

> El Paso Electric Company as lessor ("Lessor") and Sierra Properties, Inc. as lessee ("Sierra") entered into a Lease Agreement dated June 9, 1978 effective January 1, 1979, recorded in Volume 1176, Page 1331, of the Real Property Records of El Paso County, Texas, as amended by a Lease Amendment dated October 24, 1980, recorded in Volume 1176, Page 1340, of the Real Property Records of El Paso County, Texas (collectively, the "Lease"), pertaining to certain real property described in the Lease and shown as the two shaded areas labeled, "Subject Property" on the attached Exhibit A.

(Emphases in original). The lease to be terminated was thus defined as the entire 1978 lease and the 1980 amendment. The two shaded areas contained in Exhibit A and labeled "Subject Property" depicted the leased property on both sides of Stanton Street.

The next paragraph of the Termination Agreement recites the facts regarding the Deed of Trust Agreement that encumbered Sierra's property on the west side of Stanton, including the lease on that side of the street. The paragraph notes that:

> Sierra Properties, Inc. did mortgage, pledge and collaterally assign, among other property, its leasehold estate in and to a portion of the real property covered by the Prior Lease, which portion is described in Exhibit B hereto, together with such interest appertaining thereto as are described in the Deed of Trust . . . .

(Emphasis in original). Exhibit B contained a metes and bounds description of the lease on the west side of Stanton only.

The Termination Agreement then recites Sierra's default and the subsequent foreclosure and sale of the property to Security Pacific Bank. The inclusion of Exhibit B appears to have been for

19

the purpose of clarifying Seattle-First National Bank's interest in the lease, not that of trumping the prior definition and the corresponding Exhibit A. The Termination Agreement, by its very definition, provides that the entire lease was terminated.

Appellants urge us to consider the Termination Agreement in the context of the other transactions that occurred in June 1993. They contend that it is not possible to read the Termination Agreement as a cancellation of the entire lease when these transactions are considered. As noted, Seattle-First National Bank's predecessor-in-interest foreclosed on certain properties secured by the Deed of Trust Agreement and Modified Deed of Trust and subsequently purchased the properties. As a result, Seattle-First acquired the lease on the west side of Stanton Street. The parcel of land formerly belonging to Sierra that was located on the west side of Stanton Street, and which included the lease on that side of the street, was sold on June 29, 1993, by Seattle-First to Odom Investments, Inc. The Termination Agreement was executed by Sierra, EPEC, and Seattle-First in the days leading up to the sale to Odom. In conjunction with the sale, Odom entered into a lease agreement with EPEC for the land formerly leased by Sierra on the west side of Stanton. Appellants appear to argue that the inclusion of the metes and bounds description in Exhibit B to the Termination Agreement, along with the corresponding sale to Odom, shows that the parties intended to limit the Termination Agreement to the lease on the west side of Stanton Street. We disagree.

Prior to the execution of the Termination Agreement, the EPEC property on both sides of Stanton was leased by Sierra under a single lease. As a result of Odom's purchase, barring some modification or termination, the lease would be held by two owners. Thus, it appears that the Termination Agreement permitted Sierra to end its obligations under the lease and clarified that Odom, which was only seeking to acquire property on the west side of Stanton, would not be

20

responsible for payment of the entire lease on both sides of the street. The inclusion of Exhibit B made clear that Seattle-First was terminating its interest in the lease in light of the sale to Odom. Accordingly, it is reasonable to conclude that the parties intended to terminate the lease on both sides of Stanton Street. For the foregoing reasons, we overrule Appellants' first issue.

## C. Factual Sufficiency

Appellants argue that the evidence at trial was factually insufficient to support the jury's verdict that the Termination Agreement applied to the condominium property. In Question No. One, the jury members were asked whether they found from a preponderance of the evidence that the Termination Agreement included the developed property known as the Nottingham property on the east side of Stanton. The jury answered in the affirmative.

As noted above, the Termination Agreement provided that it applied to the lease and the 1980 amendment. It defined the term "lease" without any exclusion of the property on the east side of Stanton Street. Exhibit A, which corresponds with this definition, clearly depicts the property subject to the Termination Agreement as the entire leased property on both sides of Stanton Street. Although the Termination Agreement included an Exhibit B that contained a metes and bounds description of the lease on the west side of Stanton Street only, it is reasonable to assume that this was merely for the purpose of clarifying that Seattle-First was also terminating its interest in the lease on the west side of Stanton, which it obtained by virtue of its purchase in foreclosure of Sierra's property on the west side of Stanton Street. Accordingly, the jury could have reasonably concluded that the metes and bounds description did not alter the Termination Agreement's definition of the lease as being on both sides of Stanton Street. The Termination Agreement itself constitutes sufficient evidence for the jury's finding.

21

The actions of both EPEC and the Association subsequent to the Termination Agreement permit a reasonable inference that both parties considered the lease terminated. EPEC did not seek any rental payments from the Association after the Termination Agreement, and the Association did not make any such payments. Loy Wells, EPEC's representative, repeatedly testified that EPEC's position was that the lease had been terminated on both sides of Stanton Street. EPEC did not send invoices to Nottingham after 1993, because EPEC considered the lease terminated on both sides of Stanton Street. Wells also testified that EPEC paid the property taxes on the property at issue and had paid them since 1993. According to Wells, EPEC reviews records of it properties every few years to make sure that they are current. When Wells discovered that the property at issue was not leased, he sent a letter dated May 1, 2002, to Paul Hiett, along with a proposed lease. As noted above, Hiett responded by correspondence explaining that the Association did not have the authority to sign the lease, because Sierra had never finished the development and had not turned the development over to the Association. Nevertheless, the Association subsequently negotiated for a new lease. Wells testified that he met with Hiett and the Association's attorney concerning a lease and that EPEC agreed to various demands by the Association, including reduction of the rental amount. After the meeting, Wells believed that EPEC and the Association had a deal for a new lease. The Association's counsel subsequently sent EPEC a check in the amount of $1,000 for the new lease, along with a letter that stated that a signed copy of the lease would be sent once it was obtained.

Appellants presented some evidence to support their position. For instance, Kenneth Farah testified that Sierra did not have any interest or legal standing in the leased property on the east side of Stanton Street at the time Sierra entered into the Termination Agreement. Farah's testimony

22

indicated that he did not believe that Sierra could have terminated the lease on the east side of Stanton. Appellants also introduced budget documents for the years 1994 and 1995 that indicated that the Association had budgeted for the $1,200 rental payment. Hiett testified that he did not pay the rent, because EPEC did not send the Association an invoice, but that the annual rent would have been paid, if EPEC had done so. However, considering the language of the Termination Agreement, the context of its execution, and the evidence concerning the actions of both EPEC and the Association subsequent to the Termination Agreement, there was more than sufficient evidence for the jury to find that the Termination Agreement applied to both sides of Stanton Street. We therefore overrule Appellants' second issue.

## III. CONCLUSION

The judgment of the trial court is affirmed.


KENNETH R. CARR, Justice

July 10, 2008

Before Chew, C.J., McClure, and Carr, JJ.

23