

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

No. 04-19-00548-CV

**SAN ANTONIO FEDERAL CREDIT UNION**,
Appellant

v.

Mario R. **CANTU**,
Appellee

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2016-CI-21715
Honorable Cathleen M. Stryker, Judge Presiding[1]

Opinion by:     Beth Watkins, Justice
Dissenting Opinion by: Luz Elena D. Chapa, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Luz Elena D. Chapa, Justice
                Beth Watkins, Justice

Delivered and Filed: May 26, 2021

If a contractor signs an agreement with a person he knows is no longer a company's designated point of contact for managing contracts, and that person lacks actual authority to sign the agreement, may the contractor then obtain summary judgment to estop the company from asserting the former point of contact lacked authority to sign the agreement? The majority says yes. Because I disagree, I respectfully dissent.

---

[1] The Honorable David A. Canales signed the partial summary judgment ordered challenged in this appeal.

## FACTUAL BACKGROUND

Mario Cantu provided cleaning services to SACU under an agreement he signed with Mike Galland, SACU's designated point of contact for vendor contracts. The agreement was a General Services Agreement (GSA) executed in 2008. The term of the 2008 GSA was indefinite but could be terminated by either party with 60 days' notice.

SACU informed Cantu that Galland was no longer the point of contact for vendor contracts. In July 2015, Cantu attended a meeting SACU hosted for its vendors. The purpose of the meeting was to introduce the vendors to Allen VanDeventer, SACU's new Facilities Manager and the new point of contact for vendors. At the meeting, VanDeventer and Galland informed the vendors— including Cantu—that VanDeventer was "taking over" for Galland as the new point of contact for the contracts. Cantu was informed Galland's "duties were being transitioned from [Galland] to [VanDeventer]."

Cantu nevertheless executed a new GSA with Galland in November 2015, four months after the vendor meeting. The November GSA contained two terms regarding the contract's duration. According to the printed GSA form, the November GSA was a month-to-month contract that could be terminated by either party with 30 days' notice. But according to an addendum, the November GSA was a two-year contract that gave Cantu the right to cure any performance deficiencies.

## PROCEDURAL BACKGROUND

A year later, SACU sought to terminate the GSA with 30 days' notice. Cantu sued SACU, seeking expectancy damages for breach of the November GSA's two-year term. In its answer, SACU alleged multiple defenses, including: (1) Galland lacked actual authority to sign the November GSA; and (2) a GSA signed by Cantu in December 2015, which lacked the November GSA's two-year-term addendum, was the controlling agreement.

SACU and Cantu filed traditional summary judgment motions. SACU sought a declaration that the December GSA was the controlling agreement. In his motion, Cantu sought summary judgment on SACU's two defenses. Cantu argued SACU was estopped from denying Galland's authority to sign the November GSA because, even if Galland lacked actual authority, he had apparent authority to sign the contract. Although Cantu did not seek a declaration,[2] the trial court rendered summary judgment declaring the November GSA is the controlling contract.

At trial, the jury was instructed that the November GSA is the controlling contract. The jury returned a verdict in Cantu's favor, and the trial court rendered judgment in accordance with the verdict.

APPARENT AUTHORITY

I would hold the trial court erred by rendering summary judgment that the November GSA is the controlling contract and depriving SACU of the right to have a jury determine whether Cantu reasonably believed Galland had authority and justifiably relied on Galland's apparent authority—equitable matters that are generally fact issues for a jury to decide.

## A. Cantu's Summary Judgment Burden

In filing a traditional motion for summary judgment, Cantu had the burden to conclusively establish all facts necessary to show he justifiably relied on Galland's apparent authority. *See Van Duren v. Chife*, 569 S.W.3d 176, 184 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Additionally, apparent authority is based on estoppel. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). The "party relying on estoppel has the burden of proof, and the failure to prove any of the elements is fatal." *Rahlek, Ltd. v. Wells*, 587 S.W.3d 57, 72 (Tex. App.—Eastland 2019, pet. denied). Cantu

---

[2] This court has stated, "The scope of a trial court's power to render summary judgment is measured by the scope of the predicate motion for summary judgment and the specific grounds stated therein." *Hardaway v. Nixon*, 544 S.W.3d 402, 412 (Tex. App.—San Antonio 2017, pet. denied).

therefore had the summary judgment burden to conclusively establish all facts in support of his equitable theory of apparent authority.

## B. Apparent Authority

The doctrine of apparent authority "is used to prevent a principal from denying agency." *Bailey v. Paseo Del Rio Ass'n*, No. 04-04-00853-CV, 2005 WL 2989312, at *1 (Tex. App.—San Antonio Nov. 9, 2005, no pet.) (mem. op.) (citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 & n.2 (Tex. 1998)). "The essential elements required to establish apparent authority are: (1) a reasonable belief in the agent's authority; (2) generated by some holding out or neglect of the principal; and (3) a justifiable reliance on the authority." *Protect Envtl. Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 541 (Tex. App.—El Paso 2013, pet. denied).

Estoppel-based doctrines, such as apparent authority, are ordinarily questions of fact for the jury to decide; however, they may be established as a matter of law by undisputed evidence of the material facts *See Nottingham Manor Owners Ass'n v. El Paso Elec. Co.*, 260 S.W.3d 186, 197 (Tex. App.—El Paso 2008, no pet.); TEX. R. CIV. P. 166a(c); *see also JP Morgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 654 (Tex. 2018) (stating justifiable reliance is ordinarily a question of fact).

## C. The Summary Judgment Evidence Is Clearly Disputed

In an affidavit attached to his summary judgment motion, Cantu swore, "At no time did anyone at SACU tell me I should not be dealing with Mike [Galland]." He further swore "[Galland] had . . . from what I could tell, the same duties that he always had." SACU produced the deposition testimony of VanDeventer, who testified about the July 16, 2015 meeting SACU held for its vendors, including Cantu:

> Q. All right. Let's start with these meetings. . . . [W]hat's the first meeting face to face with Mario [Cantu] that you recall?

A. I believe it was July 16th of 2015 and it was a meeting with Casa Cantu and a couple other vendors. Mike [Galland] arranged the meeting, and *the meeting's purpose was to introduce me as the new point of contract* [sic] *for the contracts* and services that were being provided on some of our different vendors.

Q. Okay. And did you have an opportunity to speak to the vendors personally?

A. Yes.

Q. And what was the conversation?

A. Basically that *I would be the new point of contact* with the agreement and the services that were being provided by the various contractors, *so introducing me as taking over from Mike [Galland]*.

Q. Taking over from Mike; is that what you said?

A. *From taking over the administration of the contracts from Mike [Galland]*.

Q. Okay. Was there any discussion at that meeting regarding who had authority to sign contracts?

A. No.

Q. Is there any -- did you talk about your background, just pleasantries, your time in Alaska and all of that?

A. Yes. A little bit about the background and that to start sending all of the invoices to me for approval.

Q. *Did Mike [Galland] speak at that meeting?*

A. *A little bit. Basically saying the same thing. Introduced me as the new facilities manager.*

Q. Did Mario say anything at that meeting, that you recall?

A. Not that I recall.

Q. *Do you distinctly remember him being there? He's sitting here. (Indicating.)*

A. *Yes.*

Q. Other than addressing the group, did you have any conversations with him directly?

A. Not at that meeting, no.

Q. Okay. Were there any questions raised by any of the vendors?

A. I don't remember specifically. Basically, if there were, you know, I don't recall.

Q. Okay. Was there any discussion as to what your title was and what that meant?

***A. I believe so, you know, that I was the new facilities manager, it was a new position created within the credit union, and that the duties were being transitioned from Mike to me.***

Q. All of the duties?

A. Not all of the duties.

(emphasis added).

In sum, Cantu swore no one ever told him he "should not be dealing with Mike [Galland]." But VanDeventer swore both he and Galland told SACU's vendors, including Cantu, that VanDeventer was replacing Galland as the point of contact for vendors and contract management. Viewed in a light most favorable to SACU, VanDeventer's testimony states—in other words—he told Cantu he should not be dealing with Mike Galland. Cantu also swore he believed Galland had the "same duties," but SACU's evidence shows Cantu was told "the duties were being transitioned from [Galland] to [VanDeventer]." The majority holds this evidence is insufficient to raise a genuine dispute of material fact because the evidence requires stacking inferences. But SACU's evidence about the July 2015 meeting plainly and directly contradicts Cantu's evidence. This evidence presents a textbook example of a material fact issue foreclosing summary judgment.

The majority appears to hold these disputed facts are immaterial because: (1) "VanDeventer testified he and Galland did not tell the vendors that he was taking over all of Galland's duties"; and (2) "neither Galland nor VanDeventer told the vendors that Galland no longer had authority to negotiate or execute contracts on SACU's behalf." VanDeventer testified he and Galland told Cantu "***the*** duties (emphasis added) were being transitioned." The majority discredits and disregards this undisputed evidence because VanDeventer did not say "***all*** duties"

were being transitioned and VanDeventer's testimony was not clear and direct enough about Galland's authority. In doing so, the majority minces the words of witness testimony and thereby steps into the jury's shoes by weighing the evidence.

If Cantu had actual notice that Galland was no longer the point of contact for SACU's vendor contracts as of July 16, 2015, then a jury could find Cantu did not reasonably believe Galland had authority or justifiably rely on Galland's apparent authority to execute a GSA services contract in November 2015. Because the evidence clearly raises a fact issue as to apparent authority, summary judgment on this issue was improper.

## CONCLUSION

Apparent authority is an equitable doctrine under which—out of concerns for fairness and equity—a principal should be estopped from denying an agent lacked authority to contractually bind the principal. But when competent summary judgment evidence shows the party relying on this equitable principle has knowingly signed a contract with a person other than the one he knows to be the principal's designated agent for managing the principal's contracts, the principal has the right to have a jury decide whether the other party established the elements of apparent authority. The majority holds otherwise. Because I would reverse the trial court's judgment and remand this case for a new trial, I respectfully dissent.[3]

Luz Elena D. Chapa, Justice

---

[3] I do not address SACU's other reverse-and-remand issues, but I agree with the majority that the December GSA is not controlling. SACU's sole reverse-and-render issue regarding the limitation-of-liability provision requires construing either the November GSA or the December GSA. Because I would hold a reasonable jury could find the November GSA was not controlling due to Galland lacking authority to contractually bind SACU, and that neither GSA is controlling, I do not address the proper construction of the limitation-of-liability provision in the November and December GSAs.